## The Auditor General v. The Board of Supervisors of Menominee County.

*Constitutional law—Legislative journals—Quorum—Seating members—Protest—Officers de facto—Taxation.*

1. In passing upon the question whether a quorum of the Legislature was present when certain legislative action was taken, the Court will be controlled by what appears upon the face of the journal.

2. Parol evidence is inadmissible to alter or contradict the record of the Legislature as made by its journals.

3. The rule is well established by our own decisions that where legislative bodies are made the judges of the election and qualifications of their own members, and are vested with power to determine contested elections, their action is final, and not sub-

ject to review by this Court; citing *People v. Goodwin*, 22 Mich. 496; *People v. FitzGerald*, 41 Id. 2; *Alter v. Simpson*, 46 Id. 138; *Doran v. DeLong*, 48 Id. 552; *People v. Harshaw*, 60 Id. 200; *Weston v. Probate Judge*, 69 Id. 600; *Naumann v. Board of Canvassers*, 73 Id. 252.

4. The constitutional right of any member of either house of the Legislature to " dissent from and protest against any act, proceeding, or resolution which he may deem injurious to any person or the public, and have the reason of his dissent entered on the journal," is a mere personal privilege, having no force as legislative action, or as a statement of fact contradicting the legislative journal.

5. The Senate Journal showed that a quorum was present, and voted by yeas and nays, on the adoption of the reports of committees in favor of unseating two Senators, and that resolutions unseating said Senators, and seating the contestants, were adopted by *viva voce* vote, no roll-call being had; that on the following day the contestants were sworn in; and that thereupon a protest was filed and entered upon the journal, signed and verified by a sufficient number of Senators to break said quorum, setting forth that none of them were present in the Senate Chamber when said *viva voce* vote was taken unseating one of said Senators and seating the contestant, and that none of them voted thereon. And it is held that such protest could not be used to impeach the Senate Journal, and that the contestant, who thereafter acted as a member of the Senate, was a Senator *de facto*, and that his acts as such could not be collaterally attacked.

6. After the passage of an act of the Legislature organizing a new county from portions of the territory of three existing counties, and before the act had taken effect, the Auditor General apportioned the State taxes to the three counties, without reference to the formation of the new county, and, on the refusal of one of said counties to apportion its portion of said taxes among its respective townships, sought to compel such apportionment by *mandamus*, said act having then taken effect. And it is held that the board of supervisors of the contesting county cannot be compelled to levy upon that county the State taxes upon the basis of its valuation prior to the organization of the new county; but that the equalized valuation is capable of severance so as to enable the Auditor General to apportion, and the several boards of supervisors of the respective counties to

properly distribute, the State taxes, according to the valuation of the several townships, or even parts of townships, affected, and thus do justice to all concerned. And it is further held that the relator should have anticipated the existence of the new county, and made his apportionment accordingly; and that time is not so material as to prevent his so doing even now (December 30, 1891), which course is suggested to him as the proper one to pursue.

*Mandamus.* Argued October 29 and 30, 1891. Denied October 30, and opinions filed December 30, 1891.

Relator applied for *mandamus* to compel respondent to levy the State tax apportioned to the county of Menominee for the year 1891. The facts are stated in the opinions.

*A. A. Ellis,* Attorney General, for relator.

*F. J. Trudell,* Prosecuting Attorney (*Henry M. Duffield* and *B. J. Brown,* of counsel), for respondent.

*A. C. Cook* (*Alfred Russell,* of counsel), for Dickinson county.

McGRATH, J. This is an application for *mandamus* to compel the board of supervisors of the county of Menominee to levy the State tax apportioned to that county for the year 1891. The law provides that,—

"On or before the first day of September in each year, the Auditor General shall make and record in his office a statement showing the taxes to be raised for State purposes that year, referring to the law on which each tax is based, and the total amount of such taxes. This State tax he shall apportion among the several counties in proportion to the valuation of the taxable property therein, as determined by the last preceding State board of equalization, and shall, before the October session of the board of supervisors in each year, make out and transmit to the clerk of each county a statement of the amount of such taxes so apportioned to such county." Act No. 195, Laws of 1889, p. 238, § 22.

Section 24 provides that—

"The board of supervisors, at their annual session in' October in each year, shall ascertain and determine the amount of money to be raised for county purposes, and shall apportion such amount, and also the amount of the State tax and indebtedness of the county to the State, among the several townships in the county, in proportion to the valuation of the taxable property therein, real and personal, as determined by them for that year, which determination and apportionment shall be entered at large on their records." Id. p. 239.

Section 26·provides that—

"Each supervisor shall proceed to assess the taxes apportioned to his township according and in proportion to the valuations entered by the board of review in the assessment roll of the township of the year: *Provided* that, if the board of review make no such entry, then on the valuation therein as entered by the supervisor." Id. p. 240.

At the last session of the Legislature an act was passed entitled "An act to organize the county of Dickinson." Act No. 89, Laws of 1891. This act was approved May 21, 1891, but was not given immediate effect, and became a law October 2, 1891. Dickinson county was formed from portions of Iron, Marquette, and Menominee counties. Inasmuch as the act had not taken effect on the 1st day of September, 1891, and the act makes no provision for the emergency, the Auditor General apportioned the State taxes to Iron, Marquette, and Menominee counties, without reference to the formation of Dickinson county, and this proceeding is to enforce the apportionment by the board of supervisors of Menominee county of the amount of the State tax so apportioned by the Auditor General to that county.

The answer sets up that the act organizing the county of Dickinson is not a valid enactment, for the reason:

*First.* That a majority of the supervisors of said

detached townships and cities have assembled under color of said act, and organized as a board of supervisors of the so-called "County of Dickinson;" that none of said supervisors attended the meetings of respondent in October, 1891, and none of them now recognize any relation whatever to Menominee county; and that this respondent is and will be unable to give any direction or to exercise any efficient control over the levy, collection, and return of taxes within said townships and cities, or to levy any part of the State tax for the year 1891, apportioned to Menominee county, unless said alleged act shall by this Court be declared to be null and void and inoperative.

*Second.* That such alleged Act No. 89 of the Public Acts of 1891 was not passed by the Senate, and did not at any time receive the vote of the majority of the members of the Senate elect, but only received the votes of 16 members thereof; that the bill for said alleged act originated in the House, was there passed, and was transmitted to the Senate; that on the 20th day of May, 1891, as appears from the Senate Journal, said bill came on to be considered in the Senate, and, the question being upon its passage, on a call of the yeas and nays the name of one Charles A. Fridlender, who occupied a seat in the Senate, but was not a member of that body, was called, and his vote was counted and recorded in favor of the passage of said bill; that, excluding the vote of said Fridlender, the Senate Journal exhibits 16 votes in favor of the passage of said bill, and no more.

On the 7th day of January, A. D. 1891, in conformity to the Constitution, the Senate convened in the Senate Chamber at Lansing. Thereupon a list of members of the Senate elect for the years 1891 and 1892, duly certified by the Secretary of State, was read by the secretary of the last Senate. Included in such list was the

name of Benjamin C. Morse, as Senator-elect for the 26th senatorial district. It appeared that all of said Senators were then and there present; and each and all of said Senators, including said Benjamin C. Morse, thereupon took and subscribed the constitutional oath of office, and entered upon the discharge of their duties as Senators. On the same day the Senate was duly organized by the election of officers, and that fact was announced to the House. The Senate, as then constituted, continued until the 24th day of February, 1891.

That on said last-named day, when 17 members of said Senate were absent from the Senate Chamber, and while only 15 Senators, being less than a quorum of the duly-elected Senators, were present, the president of the Senate, with the advice and consent of 14 of these 15 Senators, and in the absence of a majority of the Senators, knowingly, unlawfully, fraudulently, and in violation of the Constitution of the State and the rules of the Senate, caused the secretary to enter upon what purported to be the journal of the Senate, but which was not such in fact, the pretended adoption of a resolution, declaring the seat of said Benjamin C. Morse vacant, and another resolution declaring Charles A. Fridlender to be duly elected Senator for said district; that only the aforesaid 15 Senators were present, and only 14 of them voted for such resolution; that the vote was not taken by yeas and nays, although Senator Taylor demanded the yeas and nays be taken and recorded, and, if the ayes and nays then had been taken and recorded, it would have appeared that there was not a quorum of the Senate present; that said resolutions were never in fact adopted by the Senate; that the president of the Senate and said 14 Senators fraudulently and corruptly conspired and caused what purported to be the journal of the Senate to be so falsely and fraudulently made and kept as

to show that such pretended resolutions had been adopted. On the following day, to wit, the 25th day of February, 1891, the said Charles A. Fridlender intruded himself into the seat of said Benjamin C. Morse, the Senator from the 26th senatorial district; whereupon the following protest, signed by the said 17 Senators, including the said George B. Horton and the said Benjamin C. Morse therein named, and by Senator Robert L. Taylor, who was present in said Senate Chamber while the proceedings complained of were had, was filed and entered at large upon the journal of said Senate:

"The undersigned, acting under section 10, art. 4, of the Constitution, hereby solemnly protest against the entire action of the Senate appearing on the journal as having been transacted after the recess in the session of February 24th inst.

"They protest on the ground that the report presented by Senator Park, and · purporting to be the report of the select committee on the contest of James H. Morrow for the seat of George B. Horton, was not the action or by the authority of the said committee.

"They protest on the ground that the report presented by Senators Crocker and Gilbert on the claim of Charles A. Fridlender for the seat occupied by Hon. Benjamin C. Morse was not by the action or authority of the select committee appointed to investigate the said claim.

"They protest on the ground that this summary determination of the right of two Senators to their seats in this body before the facts in the cases have been considered by the committees appointed to investigate them is an outrage and wrong upon the Senators concerned, upon their constituents, and upon the Senate.

"They protest against the seating of Charles A. Fridlender in the place of Benjamin C. Morse, on the ground that at the time the resolutions vacating the seat of Benjamin C. Morse, and declaring Charles A. Fridlender entitled to the said seat, were acted upon, there was not a quorum of the Senate present."

Attached to said protest is the affidavit of 16 of said Senators, including the said Benjamin C. Morse, who severally swear:

"That the official journal of the Senate of Tuesday, February 24, 1891, records that the following resolutions were adopted by the Senate, viz.:

" 'Leave being asked, and unanimous consent being granted, Mr. Crocker offered the following resolution:

" '*Whereas*, It appears that great irregularities and frauds have been committed in the township of Cummins, Oscoda county, and in the township of Harrisville, Alcona county, in votes that were counted for Benjamin C. Morse, by reason of which he was declared elected, without which said votes said Morse was not elected; therefore—

" '*Resolved*, that the entire vote of said two townships of Cummins and Harrisville be declared null and void.

" '*Resolved, further*, that the seat of the said Benjamin C. Morse in this Senate, as Senator from the 26th Senatorial district of the State of Michigan, be, and the same is hereby, declared vacant.

" 'On motion of Mr. Crocker the resolution was adopted.

" 'Leave being asked, and unanimous consent being granted, Mr. Crocker offered the following resolution:

" '*Whereas*, as the entire vote of the people in the township of Cummins, Oscoda county, and in the township of Harrisville, in Alcona county, was illegally cast by reason of gross frauds and irregularities in said townships, and by reason of which the board of canvassers declared that Benjamin C. Morse was duly elected Senator for the 26th senatorial district of this State, when, as a matter of fact, Charles A. Fridlender should have been declared elected; therefore—

" '*Resolved*, that the said Charles A. Fridlender be, and he is hereby, declared duly elected Senator for the 26th Senatorial district of Michigan, and entitled to the seat recently made vacant by the removal of Benjamin C. Morse.'

"That the entire number of Senators is 32, of which number 17 members are necessary to constitute a quorum for the transaction of any business whatever; that, at the time when said journal records said resolution to have been adopted, the above named Senators, 16 in number, each for himself swears that he was not present in the Senate chamber, and did not in anyway participate in making a quorum of said Senate, whereby the transaction of any business could be in order or legally transacted; that, at the time when said resolution purports to have been adopted by said Senate, there was not a quo-

rum of the Senate present, and no business could have been transacted; that no such resolutions, as above set forth, were adopted by the Senate at any time on said 24th day of February, A. D. 1891, when a quorum of the Senate were present; that said resolutions were not adopted by the Senate, and that said journal of said 24th day of February is entirely false and incorrect, in as far as it purports to record that said resolutions were adopted."

The affidavit of said Robert L. Taylor is also appended to said protest, setting forth that he was present, during the said session of said Senate, on the 24th day of February, 1891:

"That, at the time when said resolutions purport to have been adopted, the following Senators only were present, viz.: This affiant and Messrs. Beers, Boughner, Crocker, Doran, Gilbert, Holcomb, McCormick, Miller, Mugford, Park, Porter, Sharp, Smith, Wisner,—15 in all; that no other Senators were present, and that a quorum of said body consists of 17 members; that a less number than a quorum cannot transact any business; that no quorum was present when said resolutions purport to have been adopted; that at the time when said resolutions were pending before the Senate there was not a quorum of that body present; that this affiant arose in the Senate Chamber, and called the attention of the president to the fact that there was not a quorum present; that any member of the Senate is entitled to demand the yeas and nays on any pending question, as provided by rule No. 41 of the Senate Rules; that before said resolutions were put to vote, and while they were pending, affiant demanded that the yeas and nays be taken and recorded upon the journal; that the president of the Senate neglected and refused to comply with said request; that, if the yeas and nays had been recorded as demanded by this affiant, the result would have revealed the fact that there was not a quorum of the Senate present.

"This defendant further says that said journal of said 24th day of February is incorrect and false, in that it does not show that this affiant raised the question that there was no quorum of the Senate present, and demanded the yeas and nays, when said resolutions were pending

as hereinbefore set forth, but, on the contrary, entirely suppresses said facts."

Respondent, further answering, says:

"That it is advised that said Act No. 89, even if enacted in compliance with the forms of law, is unconstitutional and void, for the reason that there is no statute in virtue of which any portion of the State taxes for the year 1891 apportioned to Menominee county can be levied upon the territory detached therefrom since such apportionment, and made a part of Dickinson county, and said act makes no provision therefor; and for the further reason that surveyed township 39 north, of range 28 west, which was thereby detached from the township of Meyer, one of the townships of Menominee county, and attached to the township of Breen, and which is borne upon the assessment roll of the said township of Meyer for the year 1891, and is assessed thereon at the aggregate sum of $50,000 and upwards, will wholly escape taxation for said year. Said act, for the reasons hereinbefore stated, unless the same shall be declared unconstitutional and void, will prevent this respondent from levying any portion of said State taxes upon the territory so detached.

"And this respondent, further answering, denies that the State taxes so apportioned to the county of Menominee, as aforesaid, are a debt against said county; and further denies that the relation of debtor and creditor arises between the county and State, except in respect to such and so much of such taxes as shall be collected, and not paid over according to law.

"And this respondent, admitting that it can find no warrant or authority for directing the levy of any portion of said State taxes, so apportioned to Menominee county, or less than the whole thereof, avers that to levy the whole thereof on so much of the territory of said county as is exclusive of the territory sought to be detached by said alleged act, and included within the so-called county of Dickinson, would violate the constitutional rules of equality, would be productive of great wrong and injustice to the tax-payer, and impose upon him a burden which he should not be required to bear. And this respondent further avers that it owes no duty to the State to make such levy upon any less extent of terri-

tory than that upon which the apportionment was based."

The Attorney General asked that an issue be framed upon the question as to the presence of a quorum of the Senate on the 24th day of February, and at the time of the seating of Morrow and Fridlender, but we held that this Court would be controlled by what appeared in the journal.

According to the journal of the 24th, a quorum was present at the opening of the session of the Senate. Ten of the Senators whose names are appended to the protest were absent without leave. Seven of the protesting Senators were present. A large amount of business was transacted. Six of these seven were active in the business of the session, presenting petitions, making motions, giving notice of the introduction of bills, and introducing bills. Senate bills No. 20 and 87 were read the third time, and passed. Upon roll-call, 20 votes were cast for each, six of which were cast by protesting Senators. After a recess was had, Senator Park, chairman of the select committee appointed to act upon the petition and protest of Morrow against the right of Horton to a seat, reported sustaining Morrow's claim to a seat, and unseating Horton. A vote by yeas and nays was had upon a motion to lay said report upon the table. Twenty-one Senators voted upon said motion, 14 of whom voted "No," and seven of whom voted "Aye." Seven of the votes were cast by protesting Senators. Upon a motion to adopt the report the yeas and nays were called for, and 20 votes were cast,—14 in favor of the motion and 6 against. Six of the votes were cast by protesting Senators. Upon motion, the resolution submitted in the report was then adopted, but no roll-call was had thereon, the journal record being that on said motion "the resolution was adopted." Senator Crocker

then presented a report seating Fridlender and unseating Morse. The previous question was ordered, on a motion to adopt said report, by a vote of 14 to 6, on a call of the roll. The said report was then adopted by a vote of 14 to 7 on a call of the yeas and nays. Seven of the votes so cast were cast by protesting Senators. On motion, a resolution was adopted unseating Morse, and seating said Fridlender; and a roll-call was not had upon said vote, the record being that "the resolution was adopted." The journal of the 25th shows that at the opening of the session Messrs. Morrow and Fridlender were sworn in; that thereupon the said protest was filed; that. On motion, the said protest was laid upon the table upon a call of the roll, 16 Senators voted in favor of such motion, and 16 against, the president giving the casting vote.

The return here does not negative any part of this record, except that it now sets up that at the time the last vote was had there was not a quorum present. It practically concedes that a session of the Senate was had upon the 24th; that a quorum was present; that a large amount of business was transacted; that the unseating of Horton, and the seating of Morrow, was regular; that the adoption of the report seating Fridlender, and unseating Morse, was regular; and that a quorum of the Senate continued to be present during all this time. The vote had upon the resolutions in the Fridlender case appears to have followed immediately after the roll-call upon the adoption of the report, as no other business intervened. There was no recess taken, and no Senator asked to be excused. Senate Rule 11 expressly provides that "no member shall absent himself from the Senate without leave first obtained." Must it not be presumed in such case that the quorum continued to be present, and must not that presumption be conclusive? Suppose that, at

that point in the proceedings of the Senate, a few members sought to break up a quorum by retiring from the Senate Chamber. The validity or invalidity of the action taken would depend upon conflicting testimony, as to whether a sufficient number to break the quorum had actually reached the cloak or committee rooms before the vote was taken. The presumption as to the correctness of the journal in this case is supplemented by the further presumption as to the continuance of a quorum once ascertained and recorded, and that within a few moments, it may be a few seconds, of the time when the vote was had which is now attacked.

The Constitution provides that "the yeas and nays of the members of either house, on any question, shall be entered on the journal at the request of one-fifth of the members elected." It further provides that, in case a bill or concurrent resolution is passed over the Governor's veto, the vote shall be had by yeas and nays, and the names of the members voting shall be entered on the journal. Again, it provides that "no bill or joint resolution shall become a law without the concurrence of a majority of all the members elected to each house," and that, "on the final passage of all bills, the vote shall be by yeas and nays, and entered on the journal." It provides that "all votes on nominations to the Senate shall be taken by yeas and nays, and published with the journal of its proceedings." There are no other constitutional provisions respecting the call of the roll of either house, or the recording of the vote. Other matters may be determined by *viva voce* vote, and by a majority of a quorum, and the vote had need not be entered upon the journal, unless requested by one-fifth of the members elected.

But conceding that, between these two votes had, a sufficient number had gotten out of the Senate Chamber to

break a quorum, the fact still remains that on the next day the protest was laid upon the table by the Senate. Morrow and Fridlender were admitted to seats, which they continued to occupy for four months, and until the close of the session, exercising and discharging, without opposition, all the functions of Senators. But nine of the 200 public acts which were passed at that session, and probably a like proportion of the local acts, had been approved at the date upon which the action complained of was had. If the votes of these two Senators cannot be counted for the act in question, and the same is invalid for that reason, then the majority of the acts of the Legislature of 1891 (all which depend upon the votes of these Senators) must fall with it. The act in question was passed three months after the admission of these two members. It is conceded that at the time of its passage an authoritative Legislature existed, and that a constitutional quorum was present. The Legislature during the period that intervened between the 24th day of February and the passage of this act had taken no action in the direction of the unseating of these men, but instead had met and voted and treated with them as authorized and qualified Senators. The Legislature, as a body, had an undoubted right to do all that the alleged minority had undertaken to do.

The Constitution expressly gives to each branch of the Legislature the right to judge of the qualifications, elections, and returns of its members, and this Court has determined that to be an exclusive right. *People v. Mahaney*, 13 Mich. 481. In that case, Justice COOLEY, speaking for the Court, says:

"Although the courts must take judicial notice of legislative action, so far as it affects the validity of statutes, they have no such power as respects the facts attending the election of the several members; and it

remains to be seen whether we can notice those facts, *even after they have been spread upon the legislative journals,* and make them the basis of judgments, the retrospective effect of which would be to unseat members of a body long since adjourned, and to annul its action by declaring the votes of such members illegal and invalid.   *   *
*   *   *   *   *   *   *   *   *   *   *   *   *   *

While the Constitution has conferred the general judicial power of the State upon the courts and officers specified, there are certain powers of a judicial nature which, by the same instrument, are expressly conferred upon other bodies or officers; and among them is the power to judge of the qualifications, elections, and returns of members of the Legislature. The terms employed clearly show that each house, in deciding, acts in a judicial capacity, and there is no clause in the Constitution which empowers this or any other court to review their action. The 'general superintending control' which the Supreme Court possesses, under section 3 of article 6 of the Constitution, 'over all inferior courts,' does not extend to the judicial action of the legislative houses in the cases where it has been deemed necessary to confer judicial powers upon them with a view to enable them to perfect their organization and perform their legislative duties. The houses are not 'inferior courts,' in the sense of the Constitution, but, as legislative organizations, are vested with certain powers of final decision, for reasons which are clearly imperative.   *   *   *   The evils of allowing the courts a supervisory power over the decisions of the houses upon the admission of members are so great and so obvious that it is not surprising that the framers of the Constitution refrained from conferring the power. The supervision could not ordinarily be exercised during the session of the legislative body; and to correct the decisions afterwards, by annulling the laws passed, would only be to substitute a great public evil for that which might have been a wrong to an individual member, and to the district which elected him, but which could seldom affect the State at large. It can make no difference that in this case, according to the pleas, the question passed upon by the House was purely a question of law. The question of the legal election of a member is usually a question compounded of law and fact, and the House must necessarily pass upon both. If we have the power to review the decision in one case, we have in all. If we

can correct their erroneous construction of a law, we have the same power to correct any erroneous decision upon returns, qualifications, or majorities. It is sufficient for us to say that the Constitution has not conferred upon us this jurisdiction; and, whether the decision made is right or wrong, we shall leave it where it has been left by the fundamental law of the State."

The rule is well established by our own decisions that where legislative bodies are made the judges of the election and qualifications of their own members, and are vested with the power to determine contested elections, their action is final, and not subject to review by this Court. *People v. Goodwin,* 22 Mich. 496; *People v. Fitz Gerald,* 41 Id. 2; *Alter v. Simpson,* 46 Id. 138; *Doran v. DeLong,* 48 Id. 552; *People v. Harshaw,* 60 Id. 200; *Weston v. Probate Judge,* 69 Id. 600; *Naumann v. Board of Canvassers,* 73 Id. 252.

In *People v. Goodwin* the Court intimated very strongly that the Legislature could not be compelled to enter upon an inquiry, even as to the election of a circuit judge.

In *People v. Fitz Gerald* relator claimed that he had been ousted without an opportunity to be heard, and the Court say:

"No doubt fairness requires that the rights of parties in such cases shall not be disposed of without giving them a chance to be heard; but although the course taken, if the papers are true, was very censurable, we cannot review it."

The following rules are laid down by McCrary on Elections:

"Jurisdiction to determine the right of a person exercising the office of governor may be vested in the legislature, and, when so vested exclusively, courts have no jurisdiction in the premises." McCrary, § 334.

"Courts will not undertake to decide upon the right of a party to hold a seat in the legislature where, by the

constitution, each house is made the judge of the election and qualifications of its own members." Id. § 350.

"When the statute of a state provides a mode for contesting an election, that mode must be followed." Id. § 401.

"Courts will go no further than to inquire as to the legal *status* and authority of the body as a whole." Id. § 595.

The Constitution (section 6, art. 4) expressly provides that—

"No person holding any office under the United States or this State, or any county office, except notaries public, officers of the militia, and officers elected by townships, shall be eligible to or have a seat in either house of the Legislature, and all votes given for any such person shall be void."

Yet in the collection of legislative decisions compiled by that most officient officer, Daniel L. Crossman, for so many years clerk of the House, I find that in 1855—

"The Senate refused to unseat a member who was holding a county office at the time of his election, the term of which expired on the same day on which his term as Senator began. *Graves v. Hussey*, S. J. 1855, p. 154. The Senate also refused to question, on the same ground, the right of other Senators to their seats. Id. p. 69. See, also, the minority report, p. 76.

"The right of a representative to hold his seat was challenged on the same ground; of another, on the ground of his being at the time of his election a contractor with the State for the improvement of the Muskegon river, under an act passed at a previous session, at which time also he was a member; of a third, on the ground that he was receiving an annual salary of $750 as recorder or assistant recorder of Detroit, and paid from the State treasury. No further notice was taken of the challenges than to refer them to the committee on elections. H. J. 1859, p. 420.

"The House, in 1870, after exhaustive majority and minority reports, indefinitely postponed the further consideration of the eligibility of two members who held the positions of assistant assessor and assistant marshal under the United States. H. J. 1870, pp. 84, 89, 92.

"The House having once passed upon a contested election case, refused to revoke and set aside its determination, although the Supreme Court had meanwhile declared unconstitutional the statute upon which the determination of the House had been based. H. J. 1865, p. 1056. The same position was taken in the Senate (S. J. p. 594), and that body also refused to adopt a resolution declaring it 'the sense of the Senate that no Senator, the right to whose seat is involved in the resolutions reported from the committee on privileges and elections, is entitled to vote upon the question of the adoption of either until the question of the right of each to his seat shall have been decided by the Senate.'" Id. 595.

The compiler has reference to the case of *People v. Blodgett*, 13 Mich. 127. The compiler adds:

"This is a constitutional question that has often been discussed in both houses. Why a man with a post-office or county office should be ineligible is a question that has never yet been answered to the satisfaction of either house; and from the action had in several cases, as well as from the lack of action every session, that prohibition in the Constitution may be regarded obsolete. The Constitution itself overrides the prohibition by saying: 'Each house shall judge of the qualifications, elections, and returns of its members.'"

"By the Constitution, each house is the only judge of its own membership. There is no court of appeal from its decisions." Manual 1891, pp. 134, 135.

I cannot agree with the proposition that the constitutional provision may be regarded as obsolete; neither do I approve of the decisions reported. They are instances of "might," rather than "right." The difficulty lies in the absence of a remedy for these evils. The determination of every contested election case involves questions of fact, of which the Constitution makes the Legislature the sole judge. The exercise by the Legislature of this right to judge of the qualifications, etc., of its members, does not depend upon a contest. The Legislature may itself invoke the power, and proceed in the absence of any contestant's claim to a seat.

Sixteen of the protesting Senators continued to act with the Legislature and with these two members. They had an unquestioned right to set the machinery in motion, and the Legislature had an undoubted right to act in the premises. The question is not whether a movement on the part of the 16 would have been successful, or whether the sole remedy given is adequate, but whether the Legislature, having the power, acted. That body had not only the power, but the sole and exclusive power, not only to act, but to refrain, and the failure to act is as conclusive upon all the world as affirmative action would have been. The case does not differ from any other case where a member has been illegally elected or illegally admitted, and the Legislature has failed to take action, nor from any case where a certificate has been fraudulently or improperly issued, and the Legislature has refused to act.

It is urged that *quo warranto* will not lie to call in question the authority to exercise the functions of a Senator; hence the present is to be treated as a direct attack, for the reason that no other form of attack can be made. But *quo warranto* does not lie simply because the public has not committed its interests in this respect to any particular public officer, but to the Legislature. The remedy existed, but in another form. The machinery was not to be set in motion by the Attorney General, in the courts, but by the Legislature, in that body. The authority of the Attorney General to proceed in the courts did not exist, but the power of the Legislature, not only to take the initiative, but to determine that matter, was undoubted. Suppose that, in a case where *quo warranto* did lie, none had issued, would it be contended that the acts of the officer against whom it might have issued were invalid? In the present case, Morrow and Fridlender did not continue to hold by "acquiescence"

alone, in the ordinary acceptation of that term, but by the permission and consent of the body which was clothed with the exclusive authority to determine their right to exercise the functions of the office. Acquiescence, under such circumstances, has all the force and quality of ratification or confirmation. See *Attorney General v. Lothrop,* 24 Mich. 235.

There is another well-settled rule of law upon which the validity of the act in question may be safely rested, viz., that—

"The validity of an act done by one in a public office or station is not, as a rule, to be tried by the title of the person to that office."

It is well settled that the lawful acts of an officer *de facto,* so far as the rights of third persons are concerned, are, if done within the scope and by the apparent authority of the office, as valid and binding as if he were the officer legally elected and qualified for the office, and in full possession of it, and such acts cannot be collaterally attacked. Mechem, Pub. Off. 328; *Petersilea v. Stone,* 119 Mass. 465; *Sheehan's Case,* 122 Id. 445; *In re Kendall,* 85 N. Y. 302; *Brown v. O'Connell,* 36 Conn. 432; *State v. Carroll,* 38 Id. 449; *Soudant v. Wadhams,* 46 Id. 218; *Railway Co. v. Langlade Co.,* 56 Wis. 614 (14 N. W. Rep. 844); *Cole v. Black River Falls,* 57 Id. 110 (14 N. W. Rep. 906); *Yorty v. Paine,* 62 Id. 154 (22 N. W. Rep. 137); *Hooper v. Goodwin,* 48 Me. 80; *Woodside v. Wagg,* 71 Id. 207; *O'Ferrall v. Colby,* 2 Minn. 180 (Gil. 148); *Case v. State,* 69 Ind. 46; *Gunn v. Tackett,* 67 Ga. 726; *State v. Dierberger,* 90 Mo. 369 (2 S. W. Rep. 286); *Threadgill v. Railway Co.,* 73 N. C. 178; *McCraw v. Williams,* 33 Grat. 510; *Hamlin v. Kassafer,* 15 Or. 456 (15 Pac. Rep. 778); *Farrier v. State* (N. J. Err. & App.), 7 Atl. Rep. 881; *Ex parte Strang,* 21 Ohio St. 610; *Carleton v. People,* 10 Mich. 250; *Board of Auditors v. Benoit,*

20 Id. 176; *Jhons v. People*, 25 Id. 500; *Stockle v. Silsbee*, 41 Id. 615; *Carlisle v. City of Saginaw*, 84 Id. 134.

In the case of *Board of Auditors v. Benoit*, 20 Mich. 176, 181, Chief Justice CAMPBELL says:

"Nothing but actual incumbency can make a person a legal officer, however much he may be entitled to obtain the office. And, certainly, when a person stands of record as ousted, and demanding the ouster of another, who he alleges to be wrongfully in office, as a means of getting his own rights, it could not be claimed that the acts of the relator would be, in any sense, official acts. The only valid proceedings in the name of office must be those of the actual incumbent; and his acts are valid to all purposes, except, possibly, his own protection from liability as a wrong-doer."

MR. Justice COOLEY in the same case, at page 187, says:

"The public, who have an interest in the continuous discharge of official duty, and whose necessities cannot wait the slow process of a litigation to try the title, have a right to treat as valid the official acts of the incumbent, with whom alone, under the circumstances, they can transact business. This rule is an obvious and necessary one for the protection of organized society; for, as was said in *Weeks v. Ellis*, 2 Barb. 325, the affairs of society cannot be carried on unless confidence were reposed in the official acts of persons *de facto* in office. And private individuals, in controversies between themselves, are not permitted to question the acts of an officer *de facto*, for the further reason that to do so would be to raise and determine the title to his office in a controversy to which he was not a party and in which he could not be heard. And this, says Parsons, C. J., 'would be judging a man unheard, contrary to natural equity, and the policy of the law. From considerations like these has arisen the distinction between the holding of an office *de facto* and *de jure*.' *Fowler v. Bebee*, 9 Mass. 234. In *Bucknam v. Ruggles*, 15 Mass. 182, the rule and the reason for it are stated thus: 'It is an established principle of law that the acts of an officer, having color of title, in the exercise of the ordinary functions of his office, are valid in respect to the rights of third persons who may be interested in

such acts. The adoption of such a rule is necessary to prevent a failure of justice, and the great public mischief which might otherwise be justly apprehended. Besides, the officer's title ought not to be determined in a collateral way,'"—citing a number of cases.

It may be said, however, that a mere usurper cannot be said to be an officer *de facto;* yet one who at first was but a mere usurper may, by acquiescence, become an officer *de facto.*

"Although the officer *de facto* may not be required to be in by color of election or appointment, yet he must, to distinguish him from a mere intruder or usurper be in by some color of right; and, in harmony with the rule last quoted, it has been said 'that the color of right which constitutes one an officer *de facto* may consist in an election or appointment, or in holding over after the expiration of one's term, or acquiescence by the public in the acts of such officer for such a length of time as to raise the presumption of colorable right by election or appointment.'" Mechem, Pub. Off. § 319.

In *Hamlin v. Kassafer,* 15 Or. 456, the court say:

"It may be said, then, that the color of right which constitutes one an officer *de facto* may consist in an election or appointment, or in holding over after the expiration of one's term, or acquiescence by the public in the acts of such officer for such a length of time as to raise the presumption of colorable right by election or appointment. From considerations of public policy, the law recognizes the official acts of such officers as lawful to a certain extent. It will not allow them to be questioned collaterally, and they are valid as to the public, and as to third persons who have an interest in the thing done. Within the scope of his authority, the acts of an officer *de jure* are valid for all purposes. Not so with an officer *de facto;* his acts are only recognized in the law to be valid and effectual so far as they affect the public and third persons. As to these, his acts are as valid as if he were an officer *de jure.* The reason of the rule is apparent. It would be as unjust as unreasonable to require every individual doing business with such officer to investigate and determine, at his peril, the title of such officer.

" ' Third persons, from the nature of the case, cannot always investigate the right of one assuming to hold an important office, even so far as to say that he has color of title to it by virtue of some appointment or election. If they see him publicly exercising its authority, if they ascertain that this is generally acquiesced in, they are entitled to treat him as such officer, and, if they employ him as such, should not be subjected to the danger of having his acts collaterally called into question.' Besides, it is against the policy of the law to allow a suit between private individuals to determine the title to an office. Such judgment could only bind the parties, and would be of no effect as against the public,"—citing a number of cases.

In *State v. Carroll*, 38 Conn. 449, an "officer *de facto*" is defined as—

"One whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised—

"*First.* Without a known appointment or election, but under such circumstances of reputation or acquies-. cence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be.

"*Second.* Under color of a known and valid appointment or election, but where the officer had failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like.

"*Third.* Under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public.

"*Fourth.* Under color of an election or appointment by or pursuant to a public unconstitutional law, before the same is adjudged to be such."

In *Ex parte Strang*, 21 Ohio St. 610, the court say:

"The true doctrine seems to be that it is sufficient if the officer holds the office under some power having

color of authority to appoint; and that a statute, though it should be found repugnant to the constitution, will give such color."

*Railway Co. v. Langlade Co.*, 56 Wis. 614, held that although the officers were elective and not appointive, and the appointments made by the governor were invalid, yet the offices were properly created and existed *de jure;* and the persons appointed thereto, having entered upon the duties of such offices, were officers *de facto,* and their official action could not be attacked collaterally.

*Cole v. Black River Falls,* 57 Wis. 110, held that, if the public offices exist *de jure,* all persons who are in the exercise of the duties of such offices by color of law, even though such law be afterwards declared to be unconstitutional and void, are officers *de facto,* and their acts are valid.

In *Woodside v. Wagg,* 71 Me. 207, the law provided that the office of judge should be vacated by the incumbent taking a seat as a member of the legislature, and his authority as judge *de jure* would cease; but the court held that if he continued peaceably to act under his commission, and to exercise the functions of a judge, with the usual insigna of his office, he would be an officer *de facto,* and, with reference to the public and third persons, his acts, including judgments rendered by him in cases within the jurisdiction of the court, would be valid.

In *Com. v. McCombs,* 56 Penn. St. 436, the court say:

"When he who is exercising the duty of an officer is acting under the apparent authority of an act of the assembly, his title to the office is not to be assailed collaterally. An act of the assembly, even if it be [afterwards declared] unconstitutional, is sufficient to give color of title, and an officer acting under it is an officer *de facto.*"

This was not an illegitimate convocation of usurpers, but a regular session of the Senate, at which a large

amount of business had been transacted. A vote had been taken which revealed the presence of a constitutional quorum. Immediately thereafter a *viva voce* vote was taken, which is now attacked. If this vote may be questioned, then any vote had without a call of the roll of any legislative body is subject to attack.

Fridlender and Morrow could not be regarded as usurpers after a constitutional Legislature had assembled and acquiesced in the exercise by them of the functions of the office of Senator. The validity of their acts does not hinge upon any color of right upon which they were admitted, nor upon the manner or legality of their admission, but depends upon the presumption of right created by the acquiescence of the Legislature, and existing when the act was passed. The Legislature, having the sole and exclusive power to declare that they were not *de jure* officers, did not so declare, but, on the contrary, received them, and treated and acted with them, as members *de jure* of that body; and it is not in the power of the courts to say that their acts are not at least entitled to rank with those of officers *de facto*.

Nor did the filing of this protest change the character or effect of the previous day's proceeding or of that day's journal. As early as 1849 the house decided that—

"A paper which is not confined to a discussion of the action objected to, but contains reflections on the House, is not a 'protest,' within the meaning of the Constitution." Chamberlain's Appeal, H. J. 1849, p. 411.

Commenting on this decision, the compiler says:

"Webster says a 'protest' is a solemn declaration of opinion. Undoubtedly the framers of the Constitution, when they so freely granted every member the right of protest of record, intended just that, and nothing more." Manual 1891, p. 140.

The constitutional provision is that—

"Any member of either house may dissent from and

protest against any act, proceeding, or resolution which he may deem injurious to any person or the public, and have the reason of his dissent entered on the journal."

This is a personal privilege merely. It has no force as legislative action, and cannot be resorted to to nullify a legislative act. It has no force as a statement of fact contradicting the journal. It certainly was not intended that the protest of a member should have greater weight against legislative action than his vote would have. The Senate, on the morning of the 25th, had the power to correct and to expunge such portions of the journals as they deemed improperly included. The minority could not, by simply filing a protest, nullify the approval of the journal. The protest was laid upon the table and printed in the journal. It is there, not by virtue of any action of the Legislature, but by reason of the constitutional provision extending to members that privilege. It has no more force than a report, or preamble and resolution, offered and laid upon the table, although signed by two-thirds of the members of the Senate, and printed in the journal. The facts set forth in the report or in the preamble do not affect legislative action, nor can they be used to contradict the journal. The vote had, laying the report or resolution upon the table, would be the test of the legislative finding, and not the statement of facts set forth in the report or resolution. The question of the power of this Court to notice facts, even after they have been spread upon the legislative journals, and make them the basis of judgments, was fully discussed by Justice Cooley in *People v. Mahaney,* already referred to.

The act must therefore be held valid.

The only other question raised is that relating to the apportionment of the taxes by the Auditor General. The

89 MICH—37.

board of supervisors of Menominee county, as it now exists, cannot be compelled to levy upon that county the State taxes upon the basis of the aggregate valuation fixed upon that county prior to the organization of Dickinson county; but that equalized valuation is capable of severance so as to enable the Auditor General to apportion, and the several boards of supervisors of all the counties affected by the formation of the new county to properly distribute, the State tax, according to the valuation of the several townships, or even parts of townships, affected, and thus do justice to all concerned. The Auditor General should have anticipated the existence of Dickinson county, and made his apportionment accordingly, and time is not so material as to prevent him from doing that even now, and . this course is suggested to the relator.

The *mandamus* will therefore be denied.

MORSE, J. I concur in the result reached by Mr. Justice McGRATH in this case, but desire to add this in relation to the verity of the journals of the Leislature.

There is no court in the United States that has ever held that parol proof could be introduced to alter or contradict the record of the legislature as made by its journals. Such a ruling would put the validity of the passage of every law in issue, and its determination would be a question of fact to be settled upon verbal proof by a jury. I venture the assertion that no such decision will ever be made by any reputable court, unless the demands of partisanship shall be permitted to overrule the better judgment of its members. When that time comes all will be lost, for courts are now the only bodies or tribunals where justice is administered or acts done without reference to political results.

The question is not a new one in this State. The doc-

trine is as well settled as a long line of solemn adjudications can make it, that the journals of the Legislature must affirmatively show that an act was not properly or constitutionally passed, and that no other evidence can be received against the validity of the passage of an act.

In *Attorney General v. Rice,* 64 Mich. 385, it was said that—

"Any other ruling would necessarily lead to dangerous and alarming results."

In *Hart v. McElroy,* 72 Mich. 446, the authorities were reviewed, and it was shown that in some of the states the courts would not even go behind the enrolled act to find any defects. If the act was authenticated by the signatures of the presiding officers of both branches of the legislature, and approved by the governor, and certified in the published laws by the secretary of state, that was the end to all inquiry as to the constitutional methods of its enactment. It was there held that in this State the courts have power to go behind these authentications, and to examine the journals of the Legislature to determine whether constitutional methods have been followed in the passage of an act; but it was also held that the presumption is always strong that the Legislature has not violated the Constitution in the passage of an act, duly authenticated as provided by that instrument, and that *the proof furnished by the journals* must be clear in order to overcome this presumption. For other cases holding this same doctrine in this State, see *People v. Supervisor,* 16 Mich. 254; *Green v. Graves,* 1 Doug. 351; *Sackrider v. Supervisors,* 79 Mich. 59.

In determining the question whether Mr. Fridlender was a member of the Senate of this State at the time the act creating Dickinson county was passed, we are

confined by our own decisions to the journals of the Senate. We cannot take anything for granted because it appears in the answer of the respondent. It is usual in *mandamus* cases to consider the statements contained in the answer to be true, but, when the matter thus stated goes to the constitutionality of the passage of an act, it cannot be so considered. It was held in *Attorney General v. Rice, supra,* and again in *Hart v. McElroy, supra,* that courts take judicial knowledge of the legislative journals, and do not allow parties to agree or stipulate, *or admit by pleading,* that a statute was not properly or constitutionally passed by the Legislature. No matter what our personal knowledge or belief may be, we must get all our judicial knowledge of wrong-doing by the Legislature from the journals of that body, and from no other source whatever. This must be done when we are trying to ascertain whether a constitutional quorum was present at the time the member was ousted and another seated in his place, as well as in the determination of any other question involving the fact whether or not a certain constitutional direction was followed.

If the answer of the respondent is true, a great public wrong has been committed, which merits the indignant condemnation of every right-minded and honest citizen, no matter what his political affiliations or opinions may be; but, in the consideration of the question, we must not forget that our government is composed of three great co-ordinate branches, each independent of the other, and governed, under the Constitution, by its own rules and regulations, subject only to the provisions and restrictions of the organic law. The Legislature is the sole judge as to the qualifications of its members. It may, as has been often done for political purposes, declare a person entitled to hold a seat in either body who was not legally elected to such seat, and oust one who was elected,

and holds in his hand the certificate of such election from the proper authorities. Against such action the executive and the courts are powerless. The only remedy lies with the people, and they cannot adequately redress the wrong. So prevalent in latter years has been this partisan practice of deciding all questions relating to the election of members of Congress and of state legislatures that there has grown up a wide-spread feeling among the people that the provisions contained in the Federal Constitution, and all of the state constitutions, that these bodies shall be sole judges of the election and qualifications of their members, is unwise and dangerous, and should be changed so that these rights may be determined, if possible, by an impartial and non-partisan tribunal, such as a court of last resort. But, until this is done, courts must be governed by the Constitution, and cannot in any way trench upon the right of the Legislature in this respect without danger to our free institutions. The spectacle of the supreme court of any state undertaking to decide who were entitled to seats in the legislature, against the will of that body, and attempting to enforce its decrees, would soon be followed by the sight of an attempted impeachment of the judges; and riot and bloodshed might follow, as the natural result of the excitement attendant upon the conflict between these two great branches of the government.

The only question that we can determine in this case, unless we override our own precedents and the decisions of all other states where the question has arisen, is whether a quorum of the Senate was present when Mr. Morse was ousted, and Mr. Fridlender declared entitled to his seat; and this must be determined from the Senate Journal, and that alone, and every presumption and intendment must be in favor of the legislative action. From the journal it appears that a quorum was present,

and there is nothing to show to the contrary, except a protest entered upon the journal upon the next day, and signed by 16 Senators, and also by Messrs. Morse and Horton, who had been deposed from their seats, setting forth, among other things, that a quorum was not present when the proceedings to deprive Mr. Morse of his seat were taken. If this protest be true, as averred by its signers, then a quorum was not present, as under the Constitution it takes 17 Senators to constitute a quorum.

The journal of the 24th of February shows that upon the adoption of the report declaring the votes cast in the townships of Cummins and Harrisville illegal, and rejecting them, 21 Senators voted,—14 yea and 7 nay,— and the names are recorded. Separate resolutions were then adopted, declaring Morse's seat vacant, and Fridlender duly elected to the same. It does not appear that any yea or nay vote was demanded or ordered on these last two resolutions. Upon the report declaring Horton ineligible, 20 Senators voted,—14 yea and 6 nay; and the names of those voting are recorded. Upon the resolution declaring the seat of Horton vacant, and declaring Morrow legally elected to the same, it does not appear that the yeas and nays were demanded or ordered, but the resolution was carried. Attached to the protest, filed the next day, is the affidavit of 15 Senators and Mr. Morse to the effect that, when the resolutions in the case of *Fridlender v. Morse* were passed, not one of them was present in the Senate Chamber, and that there was no quorum present when such resolutions were adopted. These affidavits are supplemented by the affidavit of Senator Taylor, who swears that he was present, and that only 14 other Senators were present (naming them), which list of names does not include any of the Senators making the other affidavit. There seems to have been no protest in the case of Horton; and nothing

appears in any way upon the journals that any claim was ever made in the Senate that there was no quorum present when he was unseated, and Morrow declared elected.

It is substantially admitted by this protest and the affidavits that 6 of the protesting Senators were present when the votes were taken in both cases upon the adoption of the reports which virtually settled both cases. How and when they left the Senate Chamber before the final resolutions were passed does not appear, either in the protest or the affidavits. If they rushed out of the chamber to break the quorum, it does not so appear. They were not granted leave of absence; and the journal, upon its face, must be considered as showing them present. This protest and the affidavits cannot avail as against the journal. At best, it is not of as much strength as parol evidence. The protest itself is but an assertion of the person making it, not under the solemnity of an oath; and the affidavits of Senator Taylor and the others are *ex parte* statements under oath, without any cross-examination. It must be conceded that neither Senator Taylor alone nor all the other protesting Senators together would, under the well-settled law of every state in the American Union, be permitted to appear in court and give evidence to the same effect as this protest, against the truth of the journal entries of the 24th of February. If this be so, what effect will the law give to a naked protest or an *ex parte* affidavit, even though the same be spread upon the journals? The answer is obvious. The protest and affidavits can have no effect whatever, and can no more be considered as impeaching the verity of the journal than would parol or other proof outside of such journal. The right to protest, and to spread the same at length upon the journal, is given by the Constitution to every member; but such protest cannot be permitted to impeach the journal

entries. Therefore, it must be held, by the inexorable logic of our own previous utterances, as well as the law of the land, that the journals show a quorum present when these proceedings of the 24th of February were taken, and that such showing is not impeached by the protest, and cannot be by any evidence of any kind whatsoever, outside of such journals.

It is further shown that, notwithstanding this protest, Morse and Horton gave up their seats and retired to their homes, and the other 16 senators, for the remainder of the legislative session, from the 25th day of February until the 3d day of July, sat in the Senate, and recognized Fridlender and Morrow as Senators, without taking any steps whatever to assert their rights, or to prevent this alleged intruding into and usurpation of office by these two gentlemen, except the protest aforesaid. If they should now be declared usurpers, almost every important law upon the statute-books of 1891 would fail, and "confusion worse confounded" would be the result. There is no end to the contemplation of the damage that would naturally result to the people of this State. As the matter stands, I am satisfied that the courts have no authority to right the wrong, if any has been done, and that the evils to be endured, if there has been any wrong, are infinitesimal, compared to those that would necessarily follow a declaration upon our part that the acts of Fridlender and Morrow as Senators were void and of no effect.

To meet such cases as the present, even if it be granted that Fridlender and Morrow were unlawfully seated, the law has wisely ordained that the acts of a *de facto* officer shall have the same validity as the acts of a *de jure* officer. This rule of law applies to this case as well as to all others, and for the same reasons. It has been recognized in this State in an opinion concurred in by

all of the present members of this Court, excepting Mr. Justice McGRATH, who was not then a member of the Court. In *Carlisle v. City of Saginaw,* 84 Mich. 134, it was contended that the act consolidating the cities of Saginaw and East Saginaw into one municipality was unconstitutional, because—

"It conferred upon 15 residents of the city all rights, powers, duties, and privileges of duly-elected aldermen of the city of Saginaw, and created them a part of the common council of the city."

Here was a claim that 15 men were unlawfully created and acting as aldermen. Chief Justice CHAMPLIN, in his opinion, says:

"The 15 aldermen referred to are acting as the aldermen of the consolidated city, and they are at least *de facto* such officers as they represent themselves to be; and their acts, while acting in that capacity, will be valid. We shall not try their right to hold the offices in this collateral proceeding."

I can see no distinction between that case and this.

But here it is gravely argued, not only that the right to hold the office of Senator can be determined in this collateral proceeding, but also that Fridlender and Morrow, for some reason not heretofore known to the law, ought not to be considered as *de facto* officers, and that whenever it is found that their votes, or one of them, were necessary in the constitutional passage of a law, such law must be held invalid for that reason; and that, too, in the face of a constitutional provision that each house of the Legislature shall be the sole judge of the qualifications of its members. It is useless to argue that the unseating of these two Senators was an outrage, and done only for political effect and partisan advantage. Let it be granted, and it does not help the matter, nor add one jot or tittle to our jurisdiction in the premises. These things are becoming so common, and to be so

familiar, that perhaps this "monster of such frightful mien" grows less hateful to the people; but I trust not. The hands of no political party in power are clean in this respect. The wrongs done by Congress and every legislature in the name and at the behest of party are legion; and the courts, under our present system of government, are powerless to prevent them. It remains for the people, before it is too late,—before the courts become also the instruments of partisan advantage or malice,—to amend their organic laws so that the right of a citizen duly elected by them to a seat in Congress or a state legislature shall be passed upon by an independent and impartial tribunal, if such an one can be found or created.

The writ must be denied, for the reason stated by Mr. Justice McGRATH.

CHAMPLIN, C. J. In this case the validity of an act of the Legislature organizing the county of Dickinson, is attacked upon the ground that one of the members of the Legislature was not a Senator and member of that body, and authorized to cast his vote upon the bill organizing Dickinson county. I concur in the result reached by Mr. Justice McGRATH and Mr. Justice MORSE, and place my concurrence upon two grounds, either of which is sufficient to dispose of the questions raised.

The first ground is that section 9 of article 4 of the Constitution of the State of Michigan declares:

"Each house shall choose its own officers, determine the rules of its proceedings, and judge of the qualifications, elections, and returns of its members."

The journal of the proceedings of the Senate of the 24th day of February, 1891, shows that a session of the Senate was held, at which a quorum was present, and that certain business was transacted and bills passed; upon which the yeas and nays were taken, and which

votes show that 21 Senators were present and voting, that, during the session at which the action complained of was had, several votes were taken by yea and nay, each of which shows that a quorum of the Senate was present and voting. It also shows that the seat occupied by the Honorable Benjamin C. Morse, of the 26th senatorial district, was contested by Charles A. Fridlender; that the contest had been referred to a committee, and on the 24th day of February unanimous consent was given to the committee having the matter in charge to make a report; that they made a report, in which the majority of the committee said that they were of opinion that the votes cast in two of the townships in that district should be rejected and counted for naught, for the reason of gross frauds and irregularities committed therein. The question being upon the adoption of the report, Mr. Crocker moved that the previous question be put; Mr. Taylor calling for the yeas and nays, from which it appears that 14 voted in the affirmative and 6 in the negative, showing that a quorum was then present. The question again being upon the adoption of the report, the report was adopted, the Senators voting thereon by yeas and nays; and the names of the Senators voting are given, from which it appears that 14 voted in the affirmative and 7 in the negative. Thereupon, leave being asked and unanimous consent being given, Mr. Crocker offered the resolution that the entire vote of the two townships of Cummins and Harrisville be declared null and void, and, further,—

"That the seat of the said Benjamin C. Morse in this Senate, as Senator from the 26th senatorial district of the State of Michigan, be, and the same is hereby, declared vacant."

The journal shows that on motion of Mr. Crocker the resolution was adopted, and that, leave being asked, and

unanimous consent being granted, Mr. Crocker offered a resolution, with a preamble, in which it was stated that, as a matter of fact, Charles A. Fridlender should have been declared elected as a Senator from that district, instead of Benjamin C. Morse, and it was, therefore,—

"*Resolved*, that the said Charles A. Fridlender be, and he is hereby, declared duly elected Senator for the 26th senatorial district of Michigan, and entitled to the seat recently made vacant by the removal of Benjamin C. Morse."

It further shows that on motion of Mr. Crocker the resolution was adopted. It also appears from the journal of the 25th of February that Mr. Fridlender had taken the constitutional oath of office, which was spread upon the journal. Rule 11 of the Senate Rules provides that—

"No member shall absent himself from the Senate without leave first obtained."

There is nothing upon the journal of the Senate which shows that any Senators, after the yea and nay vote adopting the report of the committee on elections, had asked or obtained leave to absent themselves from the Senate; and neither does the affidavit filed by the Senator who was present at the time such vote was taken state that they either asked or obtained leave to absent themselves during that session of the Senate. It appears, further, from the journal of the proceedings, that the Senate did pass upon the election and qualifications to a seat in that body of both Mr. Morse and Mr. Fridlender. But we are asked in this proceeding to declare the law organizing Dickinson county null and void because it was passed by the vote of Charles A. Fridlender, under the claim that Fridlender is a usurper of a seat in that body, for the reason that, at the time he was seated, there was not a quorum of the Senate present.

This question as to the validity of a law passed by the

Legislature by the votes of persons who assumed to act as Senators or Representatives, who were not legally elected to the place, is not a new one in this State. In the case of *People v. Blodgett*, 13 Mich. 127, the question as to the legality of what was known as the "Soldiers' Voting Law" arose under a claim made over the office of prosecuting attorney for the county of Washtenaw; and it was held by Justices CAMPBELL and CHRISTIANCY that the soldiers' voting law was in conflict with the Constitution, and was therefore void. The seats of certain members of the Legislature were contested upon the ground that the law was unconstitutional, and the contest was referred to the committee on elections in the House, and they decided that those who were elected by the soldiers' votes in the field, and out of the State, were entitled to their seats; and . after the decision was handed down in the Blodgett case the House decided .that, having once passed upon the contested election case, they would not revoke and set aside their determination, although the Supreme Court meanwhile had declared unconstitutional the statute upon which the determination of the House had been based. H. J. 1865, p. 1056. The same position was taken in the Senate (S. J. p. 594); and that body also refused to adopt a resolution declaring it—

"The sense of the Senate that no Senator, the right to whose seat is involved in the resolutions reported from the committee on privileges and elections, is entitled to vote upon the question of the adoption of either until the question of the right of each to his seat shall have been decided by the Senate." S. J. p. 595.

The question of the right of this Court to interfere, and determine whether a member who was admitted to a seat in the Legislature was entitled to hold the same, came squarely before this Court in the case of *People v.*

*Mahaney*, reported in 13 Mich. 481. In that case a law was passed and ordered to take immediate effect, which required two-thirds of all the members elected to each body. The motion to give the law in question immediate effect was passed in the House by 67 votes. Nine of those voting were elected by the aid of the votes of soldiers in the field, the law authorizing which the Supreme Court had declared was unconstitutional; and taking those votes from the number, left 58 votes,—not sufficient to give the law immediate effect. The point was raised by Mr. Levi Bishop, in the case of Mahaney, as follows:

"The Act No. 21, approved February 5, 1864, by which soldiers were authorized to vote out of the State, has been declared by this Court to be unconstitutional, null, and void. *People v. Blodgett*, 13 Mich. 127. As a consequence, the 200 votes cast out of the State, for each of the 9 admitted members, were illegal and void; and these men were therefore not elected to the House by virtue of any law or any legal authority. They were not members of the House, they had no right to seats therein; and the act by which they were admitted was an act which had no authority of law, and which was in itself null and of no effect. Consequently, this police act was not ordered to take immediate effect by 67 votes, being the constitutional two-thirds of the House, but by only 58 votes out of 100, of which the House was composed. If this act, therefore, took effect at all as law, it was not till June 20, 1865; that being 90 days after the close of the session at which it was passed, which was after this board of commissioners qualified and organized, or attempted to organize, under the act. All this seems very clear, unless the clause of section 9, art. 4, authorizing each house of the Legislature to 'judge of the qualifications, elections, and returns of its members'; vests in the House the power to determine absolutely and finally all questions in regard to its own membership. It is submitted that this clause of the Constitution vests in each house the right and duty simply to determine— *First*, whether the returns or certificates of election are, in form and substance, in conformity with law; *second*,

whether a man who presents himself for membership has the requisite qualifications, according to sections 5 and 6, art. 4; *third*, whether, at a proper election, he has received a majority of legal votes cast by legal voters under the law. In this they do not act judicially upon statute or constitutional law; for the judicial power by section 1, article 6, is vested in the courts or judicial tribunals. And the whole judicial power is thus vested in the courts by this clause of the Constitution. *Chandler v. Nash*, 5 Mich. 409. The members of the House are to act in subordination to the law, and not adjudge, as a court of last resort, what that law is. When it is ascertained what the law is, they must obey it.

"This Court has authority to adjudicate upon acts of the legislative body, and to pronounce them of no effect. The whole includes every part. The legislative body includes every integral part of such body. Each house is an integral part of that body. Therefore, the power to adjudicate upon the acts of the whole body includes the power to adjudicate upon the separate acts of each integral part. 1 Kent, Comm. 504; *Supervisors v. Heenan*, 2 Minn. 330; *Wartman v. Philadelphia*, 33 Penn. St. 202. And this Court should exercise the power in any case and in any form in which the question may be presented; otherwise, there will be no way of enforcing the law of the land, and compelling its observance on the subject. This is the only remedy of the people in those instances of violation of law."

So that, the point was squarely presented to the Court; and, as the decision is in point in this case, I quote and adopt the opinion of Mr. Justice COOLEY in the case of *People v. Mahaney*, which is found upon pages 491 to 494 of that case, as being entirely decisive of this, which opinion was concurred in by all the members of the Court, and ought to settle the controversy in this case. Mr. Justice COOLEY said:

"The Constitution (article 4, § 20) provides that 'no public act shall take effect or be in force until the expiration of 90 days from the end of the session at which the same is passed, unless the Legislature shall otherwise direct by a two-thirds vote of the members elected to each house.' The session at which this act was passed

terminated on the 23d day of March; and laws not ordered to take immediate effect would, therefore, not come into operation until the 21st of June. The legislative records show that this act was ordered to take immediate effect, but the pleas set forth certain facts which, it is claimed, show that in the House of Representatives the two-thirds vote of 67 members included several who had not been elected by a majority of legal votes, but who, it is also claimed by the pleas, were notwithstanding retained in their seats by an adjudication of the House in their favor; and it is insisted that this Court is not bound by the action thus taken, but may go behind the law as approved to ascertain whether, in fact, the constitutional vote necessary to give it effect before the expiration of the 90 days was cast by members legally chosen.

" As the Court are bound judicially to take notice of what the law is, we have no doubt it is our right as well as our duty to take notice, not only of the printed statute-books, but also of the journals of the two houses, to enable us to determine whether all the constitutional requisites to the validity of a statute have been complied with. The printed statute is not even *prima facie* valid when other records, of which the Court must equally take notice, show that some constitutional formality is wanting. No plea is necessary to bring to the notice of the Court facts which the Judges must judicially know, and in respect to which no proof could be given. 1 Chit. Pl. 215; *Coburn v. Dodd*, 14 Ind. 348; *Supervisors v. Heenan*, 2 Minn. 330 (Gil. 281); *People v. Purdy*, 2 Hill, 33; *De Bow v. People*, 1 Denio, 11; *Bank v. Sparrow*, 2 Id. 101; *People v. Railroad Co.*, 12 Mich. 397.

" But although the courts must take judicial notice of legislative action, so far as it affects the validity of statutes, they have no such power as respects the facts attending the election of the several members; and it remains to be seen whether we can notice those facts, even after they have been spread upon the legislative journals, and make them the basis of judgments, the retrospective effect of which would be to unseat members of a body long since adjourned, and to annul its action by declaring the votes of such members illegal and invalid.

"It is insisted by respondent's counsel that, although section 9 of article 4 of the Constitution authorizes each

house to 'judge of the qualifications, elections, and returns of its members,' yet it does not do more than to empower them to determine—*First,* whether the returns or certificates of elections are in form and substance in conformity with the law; *second,* whether a man who presents himself for membership possesses the requisite qualifications; and, *third,* whether, at a proper election, he has received a majority of legal votes cast under the law.

"And in passing upon these questions, it is said, they do not act in a judicial capacity, to determine what the law is, since the *j*udicial power, by section 1 of article 6, is vested in certain courts and officers, but they sit under the law to apply it as judicially expounded to the facts before them.

"It is a sufficient answer to this argument that, while the Constitution has conferred the general judicial power of the State upon courts and officers specified, there are certain powers of a judicial nature which, by the same instrument, are expressly conferred upon other, bodies or officers; and among them is the power to judge of the qualifications, elections, and returns of members of the Legislature. The terms employed clearly show that each house, in deciding, acts in a judicial capacity; and there is no clause in the Constitution which empowers this or any other court to review their action. The general superintending control, which the Supreme Court possesses, under section 3 of article 6 of the Constitution, 'over all inferior courts,' does not extend to the judicial action of the legislative houses in the cases where it has been deemed necessary to confer judicial powers upon them with a view to enable them to perfect their organization and perform their legislative duties. The houses are not 'inferior courts,' in the sense of the Constitution, but, as legislative organizations, are vested with certain powers of final decision, for reasons which are clearly imperative.

"It may happen, as suggested in the argument, that with each house not only deciding for itself questions of fact, but also construing for itself the law, we may sometimes witness the extraordinary spectacle of the two bodies construing and enforcing the law differently, while a third construction is enforced by the courts upon the public at large. But, with this possibility in view, the

89 MICH.—38.

evils of allowing the courts a supervisory power over the decisions of the house upon the admission of members are so great and so obvious that it is not surprising that the framers of the Constitution refrained from conferring the power. The supervision could not ordinarily be exercised during the session of the legislative body; and to correct the decisions afterwards, by annulling the laws passed, would only be to substitute a great public evil for that which might have been a wrong to an individual member, and to the district which elected him, but which could seldom affect the State at large. It can make no difference that in this case, according to the pleas, the question passed upon by the House was purely a question of law. The question of the legal election of a member is usually a question compounded of law and fact, and the House must necessarily pass upon both. If we have the power to review the decision in one case, we have in all. If we can correct their erroneous construction of a law, we have the same power to correct any erroneous decision upon returns, qualifications, or majorities. It is sufficient for us to say that the Constitution has not conferred upon us this jurisdiction; and, whether the decision made is right or wrong, we shall leave it where it has been left by the fundamental law of the State."

It is claimed that there is a distinction between that case and the one now under consideration, in this: That the answer of the respondents asserted that, at the time, the journal of the Senate shows that a quorum was present, but there was in fact no quorum present, and therefore they are authorized to go behind the journal, and upon their individual statements contest the verity of the journal, and so show that Fridlender was not seated by a quorum of the Senate. But there can be no distinction between the two cases, because, if you may go behind the journal in one instance, you may in all cases, and contest the validity of every motion, every resolution, every bill, and every contested election, by challenging the verity of the journal, and alleging that it is false in fact, and

thus do away with all stability in legislation, and leave the resolutions and laws passed by the Legislature to rest, not in solemn records, but upon the testimony of witnesses,—a thing which has never been done, and, I venture to say, never will be done, by any court having regard for the sanctity of laws and of official records. It is sufficient for us to know that the Constitution has not conferred upon this Court power to review or reverse the determination of the Legislature, or of either body thereof, upon the question as to who are entitled to seats in that body. It was well said by Mr. Justice COOLEY that—

"If we have the power to review the decision in one case, we have in all. If we can correct their erroneous construction of a law, we have the same power to correct any erroneous decision upon returns, qualifications, or majorities. It is sufficient for us to say that the Constitution has not conferred upon us this jurisdiction; and, whether the decision made is right or wrong, we shall leave it where it has been left by the fundamental law of the State." 13 Mich. 494.

It is urged upon us that Fridlender obtained his seat in the Senate over a broken Constitution; that he is a mere usurper there; and that his vote upon any question coming before that body is a nullity. I reply to this that the question of his right to a seat was one, under the Constitution, wholly within the province of the Senate to decide, and that if he was a usurper his usurpation would not be as flagrant as the usurpation of this Court, if we undertook to decide upon his qualification as a member of that body. The Constitution has vested that power in the Legislature alone; and it is one of the powers which is beyond the jurisdiction of this Court to inquire into. But there is still a further consideration in reference to this claim of usurpation. We must not only set aside the validity of the Senate Journal, but we

must assume as a fact the contrary to be true, and that without evidence; and, if we should hold that Fridlender was a usurper, we must do it on the strength of an epithet, without proof, and against the validity of the proceedings of the Senate as recorded by that body. Let me inquire what proof there is here that Fridlender was not duly seated by the Senate. We have nothing before us but the journals of that body, and the assertion of a fact in a protest contradicting the record does not have the force and effect to overthrow the journal of that body.

The other ground of my concurrence is that Fridlender was a Senator *de facto;* and an authority cannot be found, entitled to any weight whatever, which tends in the remost degree to show that his acts are not valid while he occupied the position in that body as a member of it. It is not true that the act of a usurper is always a nullity. The question of the validity of the acts of an officer *de facto* is one which interests third persons and the public; and, as to such third persons and the public, one who is an incumbent of an office, exercising its functions and duties, is always held to be an officer *de facto,* whether he be a usurper or whether he entered under color of right.

This question was ably discussed in the case of *State v. Williams,* 5 Wis. 308. It arose out of the contest between Gov. Barstow and Gov. Bashford. Proceedings were taken in the nature of a *quo warranto* in the case of *Attorney General v. Barstow,* reported in 14 Wis. 567, over the right and title of Barstow to the office of governor. Barstow had beeen elected governor, and had filled that position. His competitor was elected; but he claimed that he was elected, and, having obtained the certificate of the board of canvassers, refused to yield the office to his successor. One of the main questions

argued in that case was whether the supreme court of Wisconsin had jurisdiction over the question to oust the governor of the state from the office of governor, and it was conceded in that case that the court had no such jurisdiction to determine the title of a member of the legislature to his office; but the court held that they did have jurisdiction to determine the right of Barstow to the office of governor, and he was ousted as a usurper after the term of his office had expired. It so happened that the legislature was in session during the time that he assumed to hold over, and that he approved and signed a bill which had been passed; and the contention was, in *State v. Williams*, that this bill was not a law, for the reason that every law required the approval of the governor, and that Barstow was not governor, being a usurper, as held by the court. But the court said the fact that he was a usurper in office did not render the act invalid; that he was an officer *de facto;* and they refused to declare the law illegal, unconstitutional, and invalid. That is a much stronger case than the present, in which we are urged to declare this law invalid because Fridlender, as is asserted, was a usurper of the office of Senator.

In the case of *Board of Auditors v. Benoit*, reported in 20 Mich. 176, it was held that a person actually in office, with the legal *indicia* of title, was a legal officer, at least so far as to render his official acts as valid as if his title were not disputed; and the Court said:

" There may be cases where the redress of the aggrieved party will be difficult, but the public convenience is not on that ground to be sacrificed. It is important to have the right man in office, but it is more important to be able to deal safely with those who are actually in place; and there would be great hardship in allowing the whole public interests to be thrown into confusion whenever a contest arises for office."

See, also, *Carleton v. People,* 10 Mich. 250, where officers were recognized as officers *de facto* who had been elected to fill offices which had not yet been created, by reason of the act under which they might have been elected not taking immediate effect.

The leading case upon the question of the validity of the acts of officers *de facto* is that of *State v. Carroll,* 38 Conn. 449, where the whole subject is ably discussed; and it is shown that a person filling an office under a statute which was unconstitutional, and therefore void, was an officer *de facto* until the law was declared to be unconstitutional by the court.

This Court has recognized the same principle in *Donough v. Dewey,* 82 Mich. at page 314, where it is said:

"While it is true that there cannot be an officer *de facto* unless there be an office to fill, yet the rule is modified so far as offices have been created by the Legislature, while the statute creating them has not been declared unconstitutional. This is upon grounds of public policy."

And in this case public policy requires that the members of the Legislature sitting in that body, and enacting laws, should be regarded as officers *de facto,* so far as the public and third persons are concerned; and their acts and votes upon measures before that body, of which they were acting as members, cannot be disputed or contested in this collateral proceeding. The authorities referred to more fully by Mr. Justice McGRATH are ample to support this Court in the position that Senator Fridlender was a Senator *de facto,* and a member of that body.

This is all that I have deemed it necessary to say upon this branch of the answer of the respondent to our order to show cause.

Upon the other branch of the case, with reference to the apportionment of the taxes between Menominee and

Dickinson counties, I concur in what is said by Mr. Justice McGRATH.

LONG, J. *(dissenting)*. This is a petition for *mandamus* to compel the board of supervisors of Menominee county to levy the State tax apportioned to that county by the Auditor General for the year 1891. The petition shows that the Auditor General made the apportionment of the State tax in proportion to the valuation as determined by the last State Board of Equalization, and that on Sept. 30, 1891, he transmitted to the clerk of that county a statement of the amount, in accordance with the provisions of section 22 of Act No. 195, Laws of 1889, and which statement was laid before the board of supervisors. The board of supervisors, at its annual session in October, 1891, passed a resolution declaring that it would not authorize or direct the levying of this tax, for the reason that the Auditor General had based the apportionment upon the valuation of Menominee county as equalized by the State Board of Equalization for said year, and included therein territory then belonging to said county of Menominee, and which has since been detached and become a part of the county of Dickinson.

The petition shows that Dickinson county was organized by Act No. 89, Laws of 1891, which took effect on October 2, 1891, that being subsequent to the date of the apportionment made by the Auditor General to Menominee county; that Dickinson county is fully organized, and has a board of supervisors; that, under Act No. 200, Laws of 1891, it is declared the duty of the Auditor General to apportion the State tax, and he has no authority to reapportion it, and that, inasmuch as it was apportioned prior to the organization of Dickinson county, it became a debt against Menominee county; that it is the duty of the board of supervisors of Menominee county to assess and collect the tax, and the

duty of the board of supervisors of Dickinson county to settle with Menominee county therefor.

An order to show cause was issued, and the board of supervisors of the county of Menominee filed an answer in this Court, which states that it declined and refused to levy any State tax for the year 1891 for the reason, among others, that while it is informed and believes that what purports to be an act of the Legislature of the State of Michigan, and which is 'entitled, "An act to organize the county of Dickinson," and purports to have been approved May 21, 1891, and which appears among the Public Acts of 1891, and is there designated as Act No. 89, is not a valid enactment, yet, in obstructing the respondent in the levy of the State tax for the current year, it has the same present effect as if it were valid. The grounds for this belief are stated in the respondent's answer, as follows:

"Said alleged Act No. 89 of the Public Acts of 1891 was not passed by the Senate, and did not at any time receive the vote of the majority of the members of the Senate elect, but only received the votes of 16 members thereof. The bill for said alleged act originated in the House, was there passed, and was transmitted to the Senate. On the 20th day of May, 1891, as appears from the Senate Journal, said bill came on to be considered in the Senate, and, the question being upon its passage, on a call of the yeas and nays the name of one Charles A. Fridlender, who occupied a seat in the Senate, but was not a member of that body, was called, and his vote was counted and recorded in favor of the passage of said bill. Excluding the vote of said Fridlender, the Senate Journal exhibits 16 votes in favor of the passage of said bill, and no more.

"On the 7th day of January, 1891, in conformity to the Constitution, the Senate convened in the Senate Chamber at Lansing. Thereupon a list of members of the Senate elect for the years 1891 and 1892, duly certified by the Secretary of State, was read by the secretary of the last Senate. Included in such list was the name of Benjamin C. Morse, as Senator-elect for the 26th sena-

torial district.  It appeared that all of said Senators were then and there present; and each and all of said Senators, including said Benjamin C. Morse, thereupon took and subscribed the constitutional oath of office, and entered upon the discharge of their duties as Senators.  On the same day the Senate was duly organized by the election of officers, and that fact was announced to the House. The Senate, as then constituted, continued until the 24th day of February, 1891.

" That on said last-named day, when 17 members of the Senate, namely, Joseph M. Weiss, George B. Horton, Jan W. Garvelink, Robert R. Wilkinson, W. H. Withington, Marden Sabin, Benj. C. Morse, Joseph Fleshiem, John H. D. Stevens, A. Oren Wheeler, Alfred Milnes, Frank L. Prindle, Aaron B. Brown, John Bastone, William Toan, Marcus Wilcox, and John R. Benson, were absent from the Senate Chamber, and while only 15 Senators—being less than a quorum of the duly-elected Senators—were present, the president of the Senate, with the advice and consent of 14 of these 15 Senators, and in the absence of a majority of the Senators, knowingly, unlawfully, fraudulently, and in violation of the Constitution of the State and the rules of the Senate, caused the secretary to enter upon what purported to be the journal of the Senate, but which was not such in fact, the pretended adoption of a resolution declaring the seat of said Benjamin C. Morse vacant, and another resolution, declaring Charles A. Fridlender to be duly elected Senator for said district; that only the aforesaid 15 Senators were present, and only 14 of them voted for such resolution; that the vote was not taken by yeas and nays, although Senator Taylor demanded that the yeas and nays be taken and recorded; and that, if the yeas and nays then had been taken and recorded, it would have appeared that there was not a quorum of the Senate present; that said resolutions were never in fact adopted by the Senate; that the president of the Senate and said 14 Senators fraudulently and corruptly conspired and caused what purported to be the journal of the Senate to be so falsely and fraudulently made and kept as to show that such pretended resolutions had been adopted.

" On the following day, to wit, the 25th day of February, 1891, the said Charles A. Fridlender intruded himself into the seat of said Benjamin C. Morse, the Senator from the 26th senatorial district; and thereupon

the following protest and affidavits were offered in open
Senate:

"'State of Michigan,'} ss.
"'County of Ingham,  '}

"'Joseph M. Weiss, William H. Withington, Alfred Milnes,
Marden Sabin, Jan W. Garvelink, Marcus Wilcox, John R. Benson,
John Bastone, William Toan, Aaron Brown, Frank L. Prindle,
Benjamin C. Morse, A. Oren Wheeler, Robert R. Wilkinson,
Joseph Fleshiem, John H. D. Stevens, being first by me duly
sworn, severally, depose and say that they are members of the
Senate of the State of Michigan for the year 1891; that the official
journal of the Senate of Tuesday, February 24, 1891, records that
the following resolutions were adopted by the Senate, viz.:

"'"Leave being asked and unanimous consent being granted,
Mr. Crocker offered the following resolution:

"'"'Whereas, it appears that great irregularities and frauds
have been committed in the township of Cummins, Oscoda county,
and in the township of Harrisville, Alcona county, in votes that
were counted for Benjamin C. Morse, by reason of which he was
declared elected, without which .said votes said Morse was not
elected; therefore—

"'"'Resolved, that the entire vote of said two townships of Cum-
mins and Harrisville be declared null and void.

"'"'Resolved, further, that the seat of the said Benjamin C.
Morse in this Senate, as Senator from the 26th senatorial district
of the State of Michigan, be, and the same is hereby, declared
vacant.

"'"'On motion of Mr. Crocker the resolution was adopted.

"'"'Leave being asked, and unanimous consent being granted,
Mr. Crocker offered the following resolution:

"'"'Whereas, as the entire vote of the people in the township
of Cummins, Oscoda county, and in the township of Harrisville,
in Alcona county, was illegally cast, by reason of gross frauds
and irregularities in said townships, and by reason of which the
board of canvassers declared that Benjamin C. Morse was duly
elected Senator for the 26th senatorial district of this State, when,
as a matter of fact, Charles A. Fridlended should have been
declared elected; therefore—

"'"'Resolved, that the said Charles A. Fridlender be, and he is.
hereby, declared duly elected Senator for the 26th senatorial district of
Michigan, and entitled to the seat recently made vacant by the
removal of Benjamin C. Morse."

"'That the entire number of Senators is 32, of which number 17
members are necessary to constitute a quorum for the transaction
of any business whatever; that, at the time when said journal
records said resolution to have been adopted, the above-named
Senators, 16 in number, each for himself, swears, that he was not
present in the Senate Chamber, and did not in any way partici-
pate in making a quorum of said Senate, whereby the transaction
of any business could be in order or legally transacted; that, at
the time when said resolution purports to have been adopted by

said Senate, there was not a quorum of the Senate present, and no business could have been transacted; that no such resolutions, as above set forth, were adopted by the Senate at any time on said 24th day of February, A. D. 1891, when a quorum of the Senate were present; that said resolutions were not adopted by the Senate; and that said journal of said 24th day of February is entirely false and incorrect, in as far as it purports to record that said resolutions were adopted.'"

This affidavit was subscribed and sworn to by all of the above-named Senators.   Supplemental to this was the affidavit of Senator Taylor, as follows:

" STATE OF MICHIGAN, } ss.
" County  of Ingham,  }

" Robert L. Taylor, being first by me duly sworn, deposes and says that he is a member of the Senate of the State of Michigan for the year A. D. 1891; that he was in attendance during the session of said body on the 24th day of February, A. D. 1891; that the official journal of said Senate of said 24th day of February, A. D. 1891, shows that the following resolutions were adopted by the Senate, viz."

The affidavit here sets out the resolutions as they appear in the affidavit of the other Senators before given.   Senator Taylor's affidavit then proceeds as follows:

" That, at the time when said resolutions purport to have been adopted, the following Senators only were present, viz.: This affiant and Messrs. Beers, Boughner, Crocker, Doran, Gilbert, Holcomb, McCormick, Miller, Mugford, Park, Porter, Sharp, Smith, Wisner,— 15 in all; that no other Senators were present, and that a quorum of said body consists of 17 members; that a less number than a quorum cannot transact any business; that no quorum was present when said resolutions purport to have been adopted; that, at the time when said resolutions were pending before the Senate, there was not a quorum of that body present; that this affiant arose in the Senate Chamber, and called the attention of the president to the fact that there was not a quorum present; that any member of the Senate is entitled to demand the yeas and nays on any pending question, as provided by Rule No. 41 of the Senate Rules; that before said resolutions were put to vote, and while they were pending, affiant demanded that the yeas and nays be taken and recorded upon the journal; that the president of the Senate neglected and refused to comply with said request; that, if the yeas and nays had been recorded as demanded by this affiant, the result would have revealed the fact that there was not a quorum of the Senate present.

" This deponent further says that said journal of said 24th day of February is incorrect and false, in that it does not show that this affiant raised the question that there was no quorum of the Senate present, and demanded the yeas and nays, when said resolutions were pending as hereinbefore set 'forth, but, on the contrary, entirely suppresses said facts."

This affidavit was subscribed and sworn to by Senator Taylor on February 25, 1891, being the same day the preceding affidavit was made.

The Senators making these affidavits, including Senator Taylor, on the same day made the following protest to the Senate, to wit:

"SENATE CHAMBER, }
Lansing, February 25, 1891. }

" The undersigned, acting under section 10, art. 4, of the Constitution, hereby solemnly protest against the entire action of the Senate appearing on the journal as having been transacted after the recess in the. session of February 24th inst.

" They protest on the ground that the report presented by Senator Park, and purporting to be the report of the select committee on the contest of James H. Morrow . for the seat of George B. Horton, was not the action or by the authority of the said committee.

" They protest on the ground that the report presented by Senators Crocker and Gilbert on the claim of Charles A. Fridlender for the seat occupied by Hon. Benjamin C. Morse was not by the action or authority of the select committee appointed to investigate the said claim.

" They protest on the ground that this summary determination of the right of two Senators to their seats in this.body before the facts in the case have been considered by the committees appointed to investigate them is an outrage and wrong upon the Senators concerned, upon their constituents, and upon the Senate.

" They protest against the seating of Charles A. Fridlender in the place of Benjamin C. Morse, on the ground that at the time the resolutions vacating the seat of Benjamin C. Morse, and declaring Charles A. Fridlender entitled to the said seat, were acted upon, there was not a quorum of the Senate present."

The affidavits heretofore set out were attached to and made a part of this protest, and the protest was signed by all the above-named Senators, including Senator Taylor.

On the coming in of this answer the Auditor General, while not admitting the right of the respondent to raise

the question of the validity of the act by asserting that Fridlender and Morrow were not properly given seats in the Senate, and that the bill was not passed except by the vote of said Fridlender, presents the following requests for issues:

"*First.* This relator alleges the truth to be that Act No. 89 of the Public Acts of 1891 was passed by the Senate of the State of Michigan, and did receive the vote of a majority of the Senators-elect, to wit, 17 votes of the legally-qualified Senators of the State of Michigan.

"*Second.* That all that part of the answer wherein and whereby it is claimed, in substance, that the seat of Benjamin C. Morse, as Senator of the State of Michigan, was declared vacant, and Charles A. Fridlender, Senator for the 26th senatorial district of Michigan, was awarded the seat made vacant by the removal of Benjamin C. Morse, by only 15 Senators, or less than a quorum of the Senate of the State of Michigan, is untrue; and in this behalf this relator says that the Senate Journal of the session of 1891 shows:

"1. January 8 (page 12 of the Senate Journal), that Charles A. Fridlender presented a petition claiming the seat as Senator of the 26th senatorial district, and duly alleging that he was elected, and that Benjamin C. Morse, who had intruded himself in said seat, was not elected.

"2. That on the 12th day of January (page 69, Senate Journal) a resolution was adopted, authorizing the appointment of a committee to investigate and ascertain the truth of the Fridlender petition.

"3. On January 13 (page 70 of the Senate Journal) a committee to investigate the said petition was duly appointed, of which Senator Crocker was chairman.

"4. That on January 15 (page 88 of the Senate Journal) the committee was duly instructed by resolution, and given authority to subpœna witnesses, etc.

"5. February 24 (Senate Journal, page 303) the Senate committee appointed to investigate the petition of Charles A. Fridlender, by Martin Crocker and Peter Gilbert, chairman and one of the members thereof, made a report showing that 100 votes were illegally cast on election day in Cummins, Oscoda county, and that 100 votes were illegally cast in Harrisville, in the county of Alcona,

and recommending that the votes of these two townships be thrown out, and a motion being made to adopt the report, the same was adopted by a yea and nay vote, 14 Senators voting therefore and 7 against; and thereupon a motion was made by Mr. Crocker, as follows."

The requests for issues then set out the resolutions given in the affidavits as heretofore stated. The requests for issues then state:

"And this relator says that all of the resolutions above set forth were duly adopted, as appears by the Senate Journal, while there were at least 21 Senators-elect present; that such fact appears from the fact that, on the question relative to adopting the report made by Messrs. Crocker and Gilbert, 21 Senators-elect voted thereon by yeas and nays; that none of said Senators had been excused, and it is expressly provided by Senate Rule 11, 'No member shall absent himself from the Senate without leave first obtained.'

"6. That on February 25 (Senate Journal, 305) the president of the Senate announced that he had, on the morning of this day, administered the oath of office to Senators Fridlender and Morrow; that he presented the following oath, subscribed to by the said Senators."

Here follows the constitutional oath of office. The requests by the Auditor General for issues then proceed:

"The oath as subscribed was ordered spread upon the journal, and was so spread at large; and this relator says that by reason of the resolution and action of the Senate, which is judge of the election of its own members, said Charles A. Fridlender became and was a duly-constituted Senator of the State of Michigan, and had a legal right to vote for the said bill organizing the county of Dickinson. A copy of that part of the official journal relating to these matters is here produced and exhibited to the Court.

"*Third.* And this relator, as above stated, prays that issues may be framed concerning the matters above set forth."

These requests for issues were signed by George W. Stone, Auditor General.

It was ordered by a majority of the Court, when these

requests for issues were presented, that the case be heard upon the petition and answer. It was further ordered that, from the facts appearing in the petition and answer, the writ of *mandamus* be denied, and that written opinions would be filed later.

I was not prepared, at the time these issues were presented, to hold that this Court had no power to inquire into the facts presented by the answer and put in issue by these requests, and, if the facts presented by the answer were established, to say that this Court was powerless to right the wrong, or that it was bound to uphold legislation procured by such revolutionary measures.

The Senate convened in the Senate Chamber at Lansing, January 7, 1891, in conformity to the Constitution. It was composed of 32 members, and among them was Benjamin C. Morse, the Senator of the 26th senatorial district. He took the constitutional oath of office, and entered upon his duties as a Senator. The Senate was organized by the election of officers, and that fact announced to the House of Representatives. From that time forward to the 24th of February, 1891, he was in his seat in the Senate Chamber, voted with that body, and was recognized as the Senator-elect from that district. He held the certificate of election from the proper board of district canvassers.

From the answer it appears that a committee was appointed to investigate Mr. Fridlender's petition, with power to send for witnesses and papers, but no report was agreed upon; when, on the 24th of February, 1891, in the absence of 17 members of the Senate, out of the 32, the chairman of the committee made a report on the petition, signed by one other member, showing that the committee had found such frauds in these two townships that their entire votes should be thrown out, and that

by reason of that fact Senator Morse was not elected. The 15 Senators, according to the affidavit of Senator Taylor, listened to this report, and adopted it. They also adopted a resolution declaring Fridlender entitled to the seat, and he was admitted to the seat, having taken the constitutional oath. This was done by less than a quorum of the Senate. Senator Taylor was present, and requested the yeas and nays to be taken on the adoption of these resolutions, but this was denied.

The Constitution provides by section 9, art. 4, that—

"Each house shall choose its own officers, determine the rules of its proceedings, and judge of the qualifications, elections, and returns of its members."

Section 8 of the same article provides that—

"A majority of each house shall constitute a quorum to do business; but a smaller number may adjourn from day to day, and compel the attendance of absent members in such manner and under such penalties as each house may prescribe."

Section 10 of the same article provides that—

"Each house shall keep a journal of its proceedings, and publish the same, except such parts as may require secrecy."

It is also provided by section 19 of the same article that—

"No bill or joint resolution shall become a law without the concurrence of a majority of all the members elected to each house."

The contention of the relator is that under section 9 of article 4, above quoted, the Senate being the body named in the Constitution to judge of the qualifications, elections, and returns of its own members, there is no power vested in the courts, under the Constitution, to review its action. This is undoubtedly true as to the action of the body itself; but the question here presented

is one of greater moment,—that is, whether less than a quorum of that body, who only have power, by the provisions of section 8 of that article, to adjourn from day to day, and compel the attendance of absent members, may usurp the powers of the body itself, unseat members of the body during their absence and in the absence of the majority, and induct strangers into their places; and the further question, whether, if this appears to have been done, this Court, in determining the constitutionality of this act, can inquire into these proceedings, and if it be found that an intruder voted for the act, and that such act did not have the necessary majority of votes for its passage (under section 19 of the article, requiring a majority vote), without counting the vote of the intruder, can pronounce the law invalid.

No right-thinking person can for a moment justify the proceedings as they are stated by the answer. If the minority of either houses shall at any time override the plain provisions of the Constitution, and unseat members, and induct into their places strangers to that body, and hold them in place, against the will of the majority, by sheer force of the organization of the house, by the power thus held,—not in number, but in position, having the presiding officer to do its bidding, the sergeant-at-arms to enforce the behests of the presiding officer, and the secretary to make such records as are thus directed,—can this Court award an issue, and inquire into the facts? If this minority could unseat two Senators, then a smaller minority might unseat all the other Senators, place strangers in their places, and by force of the organization, having the ear of the presiding officer, the strong arm of the sergeant-at-arms and his assistants to do the bidding of the presiding officer, and the aid of the secretary to keep the record, a substantially new house

89 MICH.—39.

would and could be thus organized, and no inquiry into the proceedings could be made. The record would show a quorum present, as in this instance, voting to unseat members; strangers would be given the seats and held in place by the new organization; and what before had been the minority of the house would be in control as the majority of the body.

In an exhaustive research but one parallel case has been found (*State v. Smith,* 44 Ohio St. 348, 7 N. E. Rep. 447); and this can hardly be said to be parallel to the present case. It is creditable to the legislative departments of the state governments that no such revolutionary spirit has exhibited itself during the entire period of our national existence, except in these two instances. In the case referred to, arising in Ohio, members of that bench were not entirely unanimous in their conclusions.

It appears in this case, if the answer is true, that 15 Senators—less than a quorum—have usurped the functions of that body. It was a conspiracy to do an unlawful and most outrageous act; a conspiracy to overthrow the will of the majority of that body, and to defy the people of this State. It was well planned and organized, and carried into effect with the most brazen effrontery. Every step taken in it was over a broken Constitution; and to uphold it, the journal of the body itself was made up of falsehoods. Acts less flagrant than this, in other countries, in times past, have led to revolution and the loss of constitutional liberty, which has been regained only by a long series of years of warfare, and at the cost of thousands of lives and millions of treasure. The majority of the Senators in the present case acted with great circumspection, and placed themselves upon record in such forcible language that those engaged in this great conspiracy should have been warned, and have undone

their shameful, illegal, and unconstitutional act. These men. had taken a solemn oath to support the Constitution. They could plainly read its meaning. They knew that it provided that less than a quorum could do no such act as here attempted; and that the making of a spurious and fraudulent journal, no man, having the interests of his State and government at heart, would or could uphold or approve. It is most fortunate that the term of office of such persons is short, and that the people in their sovereign power may so soon have an opportunity to visit upon them their righteous indignation.

The contention on the part of the relator is that, if the issues are allowed, the proceedings must be sent down for trial. The respondent asserts that no quorum was present when Senator Morse was unseated and Fridlender given the place. The relator denies this, and asserts that there were 21 Senators present at that time, and that the Senate Journal so shows; that it would, therefore, if the question is to be submitted for trial, become a matter of fact for the determination of a jury.

I am satisfied that there is no power vested in the courts under the Constitution to enter upon such an inquiry unless the facts can be determined from the journal of the Senate itself.

The Constitution, by section 10, art. 4, requires each house to keep a journal of its proceedings, and by section 19, art. 4, it is provided that "on the final passage of all bills the vote shall be by yeas and nays, and entered on the journal." In England, and in some of the states in this country, the courts hold that the act can only be tried by itself,—its enrollment in chancery in England; and in the states of this country, by its filing in the office of the secretary of state. In *King v. Arundel,* reported by Lord Hobart, page 111, the court said: "When the act is passed the journal is expired." In the

days of Lord Hobart the journals were not regarded as records. They were remembrances for forms of proceedings to the records; that is, the enrolled bills. It appears that Lord Coke approved this doctrine, and that Lord Hale, in a case where the defendant pleaded that a bill wanted the royal assent, would not permit the question to be raised, but held that the certificate of the bill from the court of chancery, where it had been recorded, was conclusive. *College of Physicians and Cooper or Hubert*, 3 Keb. 587.

In *State v. Young*, 32 N. J. Law, 44, it was held that, both upon the grounds of public policy and upon the ancient and well-settled rules of law, the copy of a bill, attested and filed in the office of the secretary of state, is conclusive proof of the enactment and contents of the statute; the court citing the following cases, which support that holding: *Railroad Co. v. The Governor*, 23 Mo. 353; *Fouke v. Fleming*, 13 Md. 412; *Duncombe v. Prindle*, 12 Iowa, 1; *People v. Purdy*, 2 Hill, 31, 4 Id. 384; *Eld v. Gorham*, 20 Conn. 16.

In many of the other states and in this State it is well settled that the journals are to be regarded. They are required to be kept, and where they show that a bill has been passed by a majority of the house they cannot be rebutted by parol proof.

In *State v. Moffitt*, 5 Ohio, 363, it was held that the journal could not be contradicted by parol proof. The same ruling was made in *Koehler v. Hill*, 60 Iowa, 545 (14 N. W. Rep. 738).

In *Wise v. Bigger*, 79 Va. 279, the claim was that the act had not passed the Senate by the requisite majority. The court said:

"To inquire into the veracity of the journal of the senate in which it has recorded its proceedings would be to violate both the letter and the spirit of the constitu-

tion, to invade a co-ordinate and independent department of the government, and to interfere with the separate and legitimate power and functions of the legislature."

It was further held that the journal imparted absolute verity.

In *People v. Mahaney*, 13 Mich. 492, Mr. Justice COOLEY, laying down the rule that courts are bound judicially to take notice of what the law is, and have the right, as it is their duty, to take notice, not only of the printed statute-books, but also of the journals of the two houses, to determine whether all the constitutional requisites to the validity of a statute have been complied with, says:

"The printed statute is not even *prima facie* valid when other records, of which the Court must equally take notice, show that some constitutional formality is wanting;" citing in support of this proposition: 1 Chit. Pl. 215; *Coburn v. Dodd*, 14 Ind. 348; *Supervisors v. Heenan*, 2 Minn. 330 (Gil. 281); *People v. Purdy*, 2 Hill, 33; *De Bow v. People* 1 Denio, 11; *Bank v. Sparrow*, 2 Id. 101; *People v. Railroad Co.*, 12 Mich. 397.

In *Attorney General v. Rice*, 64 Mich. 385, the question came directly before this Court whether the legislative journals kept in pursuance of section 10, art. 4, of the Constitution, and duly certified by the proper officers, could be contradicted by parol testimony. Mr. Justice MORSE, speaking in that case, said:

"Are these journals, kept by the clerk of each house, and read and corrected each day by each body, and duly certified by the proper officers to be correct, to stand as conclusive evidence of their proceedings, or are they liable to be disputed and overthrown by parol testimony, either of individual officers and members or of strangers, who may be interested in nullifying legislative action? It would seem that there can be but one answer. The legislative record must prevail. Any other ruling would necessarily lead to dangerous and alarming results."

That the Court cannot enter into this inquiry by the introduction of parol testimony to impeach the journal of the Senate is supported by the whole weight of authority in this country as well as in England.

But it is not necessary to enter upon this inquiry, and award issues to try the question of fact whether a quorum was present on the 24th of February, when Senator Morse was unseated, and Mr. Fridlender given a place in that body. It appears from the journal of the Senate that the protest made by the majority of the Senate was entered upon the journal on the morning of the 25th of February; and there is no denial of that fact by the requests for issues here presented. As we have said, the Court may always look into the journals, and ascertain whether a bill has been passed · by the constitutional majority of Senators-elect. Looking into the journal, therefore, and excluding all inquiry outside of it, we find that on February 24, 1891, the Senate, a majority of the members being present, passed the resolutions unseating Senator Morse and seating Mr. Fridlender. Looking into the journal of the Senate on the morning of the 25th of February, we find that the majority of the members-elect attempted to undo the action of that body of the day before. The journal of the day before had not at that time—on the morning of the 25th—been approved by that body. The inquiry is then to be made whether the majority of the members-elect could on the morning of the 25th of February ·undo the work of that body of the day before, admitting, what the journal shows, that a majority was present on February 24, at the time the resolutions were passed. There can be no question but that the same body that passed the resolutions of the 24th of February could have rescinded them on the morning of the 25th and given the seat to Senator Morse, unless it was estopped, under parliamentary usages, by the

motion to reconsider the vote, and the motion following that, to indefinitely postpone the reconsideration of the vote, which will hereafter be noticed. What, then, was the effect of the affidavits and protest which we find spread upon the journal of the Senate on the morning of the 25th of February? Upon the filing of these affidavits a written protest was made by 17 Senators, and an effort made to expunge the record of the day before. Can it be said that this did not in fact rescind the resolutions of the 24th of February? If it did not rescind that action, how could such action be rescinded? The majority of the members had the power to do it and in fact did it, except that the president of the Senate and the secretary, together with these conspirators, having the control of the body, though allowing the affidavits and protest to be filed, did not spread upon the journal the fact of rescission. I think it had the effect of a rescission, and that, therefore, Mr. Fridlender was but a stranger in that body; and that this fact appears from the journals themselves, even admitting all that is claimed by the requests for issues. We need not go beyond the journal to determine these facts.

It must be conceded that the Senate, under section 9, art. 4, of the Constitution, had the right to judge of the qualifications, elections, and returns of its members; but the journal of the 25th of February, 1891, conclusively shows that the journal of the 24th was and is false and fraudulent; that it was made up by less than a quorum of that body, and the proceedings spread upon the record by the secretary by the direction of the presiding officer. The journal of the Senate of the 24th of February shows, as to the adoption of the resolutions unseating Senator Morse and seating Mr. Fridlender, as follows:

"On motion of Mr. Crocker, the resolution was

adopted. Mr. Park moved to adjourn, which motion did not prevail. Mr. Doran moved to reconsider the vote by which the resolution was adopted unseating Benjamin C. Morse from his seat in the Senate. Mr. Park moved to indefinitely postpone the motion to reconsider the said vote, which motion prevailed. Mr. Doran moved to reconsider the vote by which the resolution was adopted seating Charles A. Fridlender as Senator from the 26th district, in the stead of Benjamin C. Morse. Mr. Park moved to indefinitely postpone the motion to reconsider the said vote, which motion prevailed."

This was the last business done by the minority of the Senate on the afternoon of the 24th of February. It will be noticed here that the attempt was made, by these motions to reconsider and to indefinitely postpone, to place the matter of unseating Senator Morse and seating Mr. Fridlender beyond any action which the majority might take on the next day; but, if this was done by a minority, it would have no such effect.

It appears from the journal of the 24th itself that, on the adoption of the resolution as to the unseating of Senator Morse and seating Mr. Fridlender, the yeas and nays were not ordered, and the vote was not so taken; so that there is no direct proof on the journals of the 24th that a quorum was present at the time such resolutions were adopted. But it is said that this Court must presume that such quorum was present at that time from the fact that a quorum was present at the time of the adoption of the resolution in the Morrow matter, and at the time the report of the two Senators—Crocker and Gilbert—was presented in the Morse matter. This would undoubtedly be true under Senate Rule No. 11, that "no member shall absent himself from the Senate without leave first obtained," were it not for the facts appearing on the journal of the 25th. As we have seen, when the resolutions were presented to unseat Senator Morse and seat Fridlender, the yeas and nays were not called, though

in the adoption of the report of Senators Crocker and Gilbert in the Morse matter they were called, and the report was adopted, recommending that the votes in the two townships be thrown out; so that all that appears upon the journal of the 24th as to a quorum being present at the time of the adoption of the resolutions unseating Senator Morse and seating Fridlender is the presumption of a quorum, by reason of a quorum being present at the time the report was presented and adopted. This presumption would stand as absolute proof of the fact if it were not for the facts appearing upon the next day's journal. We are asked to take this presumption as conclusive evidence of the fact. We are also asked to say that the proceedings of the 25th are not evidence of the facts which rebut that presumption, and that the affidavits and protest spread upon the journal of the 25th are not evidence which may be considered by the Court in determining whether a quorum was present on the 24th. Why not? It is well settled that we may take notice of the contents of the journals. Why take notice of the journal of the 24th and exclude that of the 25th? Although it is not so stated therein, yet, presumptively, the journal of the 24th shows a quorum present at the adoption of the resolutions. But when we read that of the 25th, is not the presumption rebutted, and to the mind of every one so rebutted that it carries conviction that no quorum was present on the 24th at that time? Who, in all that body of Senators assembled there on the 25th, when the affidavits of those 17 Senators were read, arose and pronounced those affidavits untrue? Who, throughout this entire Commonwealth, questioned the truth of the matters contained in those affidavits? Who questions them now? There is but one answer. No one questioned them then, and no one questions them now, except the relator, who does so in a qualified way, by the declaration that

no Senator could absent himself without leave first obtained. Shall this Court, therefore, exclude what appears upon the journal of the 25th as evidence of the facts there appearing?

What is evidence? Mr. Greenleaf says it is "that which is legally submitted to a competent tribunal as a means of ascertaining the truth of any alleged matter of fact under investigation before it." Must this Court, upon the subtleties of the lawyers, determine that which so plainly appears to all laymen as true is not true, or that by reason of some technicality of the law this Court cannot take as evidence that which convinces everybody else? 16 Senators, under the solemnity of their oaths, swear that they were not present on the 24th at the time those resolutions were adopted; and Senator Taylor swears that those 16 members were not present, and that, pending the adoption of the resolutions, he asked to have the yeas and nays taken; that he called the attention of the president of the Senate to the fact that no quorum was present; and he gives the names of the Senators then present, and says that none others were present. This affidavit explains why the journal does not show the call of the yeas and nays, though upon the adoption of the report previous to that the yeas and nays were called and recorded. Is not the journal legally submitted to us? Are not these affidavits a part of that day's journal? The affidavits and the protest are a part of the journal, and are evidence of the facts therein stated, under the provisions of section 10, art. 4, of the Constitution, and sufficient, not only to overcome the presumption of the presence of a quorum at the time of the adoption of these resolutions, but to convince the mind of that fact beyond all reasonable doubt. The Court should therefore consider this evidence, and determine that no quorum was present on the 24th of February at the time

Senator Morse's seat was declared vacant, and Fridlender seated in his place. Any other rule than this would be dangerous in the extreme, as it would place absolute power in the hands of a minority of the body, who could always make the journal show a quorum present, and the majority could never undo its action. Under the rule contended for they could come into the body on the following morning, show to the presiding officer that they were not present on the prevous day, have their affidavits recorded and protest entered, but could not correct the record; and their affidavits and protest could not be used as evidence anywhere to prove the fraudulent transaction. Suppose the journal showed a bill to have passed on its third reading by the vote of every Senator-elect, and on the next morning 30 of the Senators present their affidavits, stating that they were not present, and did not vote for the bill, and protest against the action of the minority. The presiding officer says he will permit the affidavits and protest to appear upon the journal, but will not expunge the record, or allow the journal to be corrected. Would this Court uphold such legislation? A bare statement of the proposition is a sufficient answer. This Court would at once say that the bill had not become a law, for the reason that it had not received the majority vote of all the Senators-elect, as provided by section 19, art. 4, of the Constitution. But what is the proof of this fact? The affidavits and protest of the 30 Senators found on the Senate Journal on the next morning after the bill is claimed to have passed. Suppose the Court said that it would not receive this as proof of the fact. Who legislates? What body passes the laws? How can the president of the Senate and the secretary and the two Senators present, who have done these acts, be reached? The majority of the Senate attempts to undo it, and cannot, and the Court is power-

less to inquire into it. The affidavits and protest, though entered upon the journal, cannot be taken as proof of the facts, and the Court is compelled to say that the ` bill received the constitutional majority vote necessary to its passage. Such a ruling as this would place power in the hands of the president and secretary of the Senate to adopt or nullify every act attempted by the majority of that body. No court could or would approve such a doctrine. But why receive this as proof of the facts contained in the affidavits in one case, and not in the other? Why hold it as proof of the fact that a bill was not constitutionally passed, and reject it as proving the fact that a quorum was not present when any other act is claimed to have been done which a minority could not do? The Senate itself may do these acts, and the Court cannot reach it, or undo its action, however wrong it may appear, as each House is exclusively the judge of the qualifications, elections, and returns of its own members. But I am not willing to hold that a minority has any such power as here claimed. Had the facts appeared in *State v. Smith, supra,* as here appear,—that is, had the absent Senators appeared on the next morning, and protested against the action of the minority,—a very different question would have been presented to that court. But that did not occur there, and that court held, as I should hold if these facts did not appear upon the next morning's journal, that the journal of the 24th was conclusive of the fact, and that parol testimony could not be introduced to contradict it. From these facts it appears that Senator Morse was never removed from his office as Senator, and Mr. Fridlender was never declared elected thereto. Mr. Fridlender, therefore, was never a Senator.

In entering upon the inquiry as to whether the bill organizing Dickinson county received the constitutional

vote necessary to its passage we may take notice of the fact that Mr. Fridlender was not a Senator.

In *State v. Francis,* 26 Kan. 724, the question came before the supreme court of Kansas whether a bill making appropriations for the state fish commissioner for the years 1880 and 1881 had passed the house of representatives by the necessary majority vote. In that state, as in this, the constitution provides that on the passage of every bill it shall require the majority vote of all the members-elect of each house. Section 2 of article 2 of the constitution of that state in 1873 had been amended to read as follows:

"The number of representatives and senators shall be regulated by law, but shall never exceed 125 representatives and 40 senators. From and after the adoption of the amendment, the house of representatives shall admit one member from each county in which at least 250 legal votes were cast at the next preceding general election; and each organized county in which less than 200 legal votes were cast at the next preceding general election shall be attached to and constitute a part of the representative district of the county lying next adjacent to it on the east."

Acting under this amendment, the legislature apportioned the representatives among the counties, giving to each county at least one representative where 250 votes were cast, making the total representation in the house 129. The whole 129 representatives took their seats in the house, and acted during the session, and passed the bill in question. The court held that the amendment to the constitution only provided for the election of 125 members to the house. That court was composed of Hon. ALBERT H. HORTON, Hon. DANIEL M. VALENTINE, and Hon. DAVID J. BREWER, the last of whom is now one of the Associate Justices of the Supreme Court of the United States. They were all able men, and among the best lawyers of the country. The question presented was

curious and novel. They discussed the power of the court to examine the journal of the house to determine who were legally elected to the body, and they determined from the journals that the members elected from Rooks, Rush, Harper, and Kingman counties were not legally elected, and were not members of the house. It was said:

"Whenever the house of representatives consists of more than 125 members, some of such members must be there illegally. Such was the case in 1879 [the time when the bill in question is claimed to have been passed]. The house of representatives at that time consisted of 129 members. Four of these members, to wit, the four from Rooks, Rush, Harper, and Kingman counties, who were not provided for by law, and who were the lasts members admitted to their seats, were not entitled to their seats. And the act in controversy was passed only by the assistance of their votes. Except for their votes, or at least three of their votes, the act would not have received a constitutional majority of the votes of the members of the house; and, not counting their votes, the act did not receive a constitutional majority. Now, we do not think that their votes should be counted; and therefore we think the act in controversy must be held as not having passed the house of representatives, and as void."

If these votes should not have been counted under the circumstances stated in that case, why should the vote of Fridlender be counted? He was never a Senator any more than those persons were members of the Kansas house of representatives. It is true that in that case the constitution recognized only 125 members; but in the present case Mr. Fridlender was never elected or appointed to the office by any power or authority recognized by the Constitution of this State.

But it is said that the respondent here could not question the action of the minority in the present case, for the reasons—

1. That it is a collateral attack upon the bill before us, organizing Dickinson county.

2. That the Senate acquiesced in the action of the minority by sitting with these usurpers during the remainder of the session.

3. That these usurpers are Senators *de facto*.

I cannot agree with any one of these propositions. *Quo warranto* could not have been brought to inquire into or determine the right of these usurpers to hold the seats into which they were inducted by these unlawful means. The present is the only form in which an attack under their proceedings could be made. Under section 19, art. 4, of the Constitution, this Court may inquire whether a bill has received the requisite number of votes to pass it. At present I am not speaking of how the inquiry can be made,—what proofs may be resorted to by the Court to ascertain the fact; but, if the Court finds that a bill has not received the constitutional majority vote necessary to its passage, the act will be held void. *Attorney General v. Joy*, 55 Mich. 99. It was said by Mr. Justice COOLEY in the above case that—

" A bill considered in the Legislature, but not constitutionally passed, can never become a law by its being signed by the Governor, and published with the statutes. That is too plain a proposition to need argument or illustration."

In *Attorney General v. Rice*, 64 Mich. 385, the attack upon the bill was that it had not been introduced into the House during the first 50 days of the session. The Court held that, if the Constitution had not been complied with in the passage of the act, that fact could be shown, but limited the proof of the fact to the journal of the House. In these cases it was not thought that the attack was a collateral one.

It must be remembered that the attack upon the bill in the present case is that it did not receive the consti-

tutional majority vote in the Senate. The reason of this assertion is that Fridlender was a mere intruder into that body. If it be conceded that he was a mere intruder, that he was there as a stranger, why should it be held that the bill was constitutionally passed, as it required his vote to make the necessary majority?

It seems to me to need but little argument to show the fallacy of the second point raised,—that is, that the Senate acquiesced in the action of the minority in seating this intruder by continuing to sit. The facts, as made to appear from the journal itself, show no such acquiescence. The majority attempted to expunge the record of the 24th of February. Failing in this, they attended to their duties as Senators, voted upon measures coming before that body, but in no way recognized the intruder as there by right. Acquiescence means—

" A quiet assent, a silent submission, with apparent content, distinguished from avowed consent on the one hand, and on the other from opposition or open discontent."

The protest filed showed the dissent of the majority; but the power of the house kept him in place. Must the majority each day have objected to the presence of this intruder? Must they, upon the final passage of every bill, have made the objection, and, upon failure to do this, be said to have acquiesced? I think not.

It is said that Fridlender was a Senator *de facto*. Judge Cooley defines "an officer *de facto*" to be—

"One who, by some color of right, is in possession of an office, and for the time being performs its duties with public acquiescence, though having no right in fact." Cooley, Const. Lim. (6th ed.) p. 750.

Lord Ellenborough's definition is:

" One who has the reputation of being the officer he assumes to be, and yet is not a good officer in point of law." *King v. Bedford Level*, 6 East, 356.

It cannot be said that Fridlender performed the duties of that place with public acquiescence, or that he had the reputation of being the officer he assumed to be. From the journal it clearly appears that he was placed in the Senate by fraud, and by overriding the plainest provisions of the Constitution, by a minority of that body; and he had no reputation of being the officer he assumed to be. He was no more than an intruder, who is defined to be—

"One who attempts to perform the duties of an office without the authority of law, and without the support of public acquiescence." *Town of Plymouth v. Painter,* 17 Conn. 585; *Peck v. Holcombe,* 3 Port. (Ala.) 329; *Petersilea v. Stone,* 119 Mass. 465; *Hamlin v. Kassafer,* 15 Or. 456; *Hooper v. Goodwin,* 48 Me. 80; *Tucker v. Aiken,* 7 N. H. 113; *McCraw v. Williams,* 33 Grat. 510.

The distinction between an officer *de jure,* one who is *de facto,* and a mere usurper is well known and clearly defined. An officer *de jure* has the legal title to, and is clothed with all the power and authority of, the office. He has a title against the world to exercise the functions of the office and receive the fees and emoluments appertaining to it. He is responsible to the government and injured parties when he abuses his trust or transcends his authority; and his acts within the scope of that authority cannot be questioned by the citizen or any department of the government. An officer *de facto* is one who comes in by the power of an election or appointment, but, in consequence of some informality or want of qualification, or by reason of the expiration of his term of service (or, it may be said, also by entering upon the duties of his office before the term of service fixed by law begins), cannot maintain his position when called upon by the government to show by what title he holds his office. He is one who exercises the duties of an

89 MICH.—40.

office under claim and color of title, being distinguished on the one hand from a mere usurper, and on the other from an officer *de jure*. A mere usurper is ono who intrudes himself into an office which is vacant, or ousts the incumbent, without any color of title whatever; and his acts are void in every respect. *McCraw v. Williams*, 33 Grat. 510; *Hooper v. Goodwin*, 48 Me. 80; *Hamlin v. Kassafer*, 15 Or. 460.

By what claim and color of title did Fridlender act? It is true that there was an office to be filled; but it was filled by an officer *de jure*. There could not be an officer *de jure*,—one who had the legal title to and was clothed with all the power and authority of the office, and actually exercising its functions,—and at the same time an officer *de facto*, claiming to exercise the functions of the same office. Benjamin C. Morse was holding the certificate of the board of canvassers, was recognized as the officer *de jure*, sworn in, exercised all the functions of the office, and, as we have seen, was never ousted by any power authorized to oust him. He was, therefore, in that particular office of which it is claimed Fridlender was exercising the functions *de facto*. If Senator Morse had been actually ousted, there might be strong reason for claiming that Fridlender was a *de facto* officer; but there was no office for him to fill, as it was already filled. In the very nature of the case, there can be no officer *de facto* where no officer *de jure* is provided for by law; or, as is said in one case: "There can be no officer, either *de facto* or *de jure*, if there is no office to fill." *Carleton v. People*, 10 Mich. 250; *Norton v. Shelby Co.*, 118 U. S. 425 (6 Sup. Ct. Rep. 1121); *Yorty v. Paine*, 62 Wis. 154; *Cole v. Black River Falls*, 57 Id. 110; *In re Hinkle*, 31 Kan. 712 (3 Pac. Rep. 531); *Burt v. Railroad Co.*, 31 Minn. 472 (18 N. W. Rep. 285); *Leach v. People*, 122 Ill.

420 (12 N. E. Rep. 726); *People v. White,* 24 Wend. 539.

In *Carleton v. People, supra,* it was said by Mr. Justice CAMPBELL, Mr. Justice CHRISTIANCY concurring, that,—

"Where the law itself negatives the idea that there can be a legal incumbent, any one assuming to act assumes what every one is bound to know is not a legal office, and his acts cannot be effectual for any purpose."

In *Lawrence v. Hanley,* 84 Mich. 399, it was said that—

"The claim that Collins was ever legally or peaceably dispossessed of the office is untenable.   He never abandoned his office."

In that case the sheriff attempted to oust Collins as a member of the board of the Wayne county auditors. The other members claimed that he was ousted, and that Mr. Leteker was in; and this Court held that Mr. Collins was never out, and therefore Mr. Leteker never in the office. In the present case Mr. Morse did not abandon the office, but protested against the attempt on the part of the minority to oust him.

In *Mason v. Mayor, etc.,* 35 N. J. Law, 190, the office of city treasurer could, under the city charter, be filled only by a majority meeting of the board of aldermen. The defendant, who had been admitted to the office by an election at which less than a legal number of aldermen was present, claimed, against the relator's application for *mandamus,* that, as he was in office *de facto,* and under color of an election, *quo warranto,* and not *mandamus,* was the proper remedy. The court held, however, that the election by the aldermen in violation of their own organic law was a mere nullity, and, all the facts being before the court, a peremptory *mandamus* went in the first instance.

In *Eaton v. Walker,* 76 Mich. 579, it was held by this Court that a corporation *de facto* cannot exist in the absence of a law authorizing its organization; and in

such a case the carrying on of the business in the corporate name is no evidence of user which can be considered in aid of corporate existence.

It is just as evident that two persons cannot at the same time be in actual occupation and exercise of an office for which one incumbent only is provided by law. Here Morse was in possession of the office as a Senator *de jure*. He was not removed in fact, and there was no place for an officer *de facto*. As well might any stranger have stepped into that body and assumed to have the right to vote upon the passage of bills before the Senate.

In *State v. Francis*, 26 Kan. 724, the constitution of Kansas fixed the number of representatives at 125. Four more were elected to that body, and acted with the body during its session. Yet the court held the act invalid, as it required three of those four votes to pass the bill. It was not thought that those four extra members were officers *de facto* because they assumed to act. They were treated as intruders by the court, and their votes excluded in determining the question raised.

I have no desire, and it is not my purpose, to hold that this Court has any power to interfere with the legislative branch of the State government when acting within its proper sphere, and within constitutional bounds. Under our system of government, the three branches—the executive, the legislative, and the judicial—are coordinate, one acting as a check upon the other. The executive may interpose his veto upon any act, and it can become a law only by a two-thirds vote of the members-elect to each house. Even when this is done, the act may be submitted to the judicial department, to determine whether the act has been constitutionally passed. The Court of last resort has always been regarded as the last refuge of a broken Constitution. When both branches of the Legislature and the executive, having

undoubted power to act, and acting in good faith, over-step the Constitution in the attempt to enact a law, this Court is clothed with abundant authority under the Constitution to overturn it, and declare it a nullity. Why is not this Court, then, clothed with power, when a minority of one of the branches of the Legislature oversteps the plainest provisions of the Constitution, so to declare, and to nullify its acts? It seems to me that no other conclusion can be reached which satisfies the mind than that Mr. Fridlender was a mere stranger in the Senate, and that this Court should not count his vote in determining the constitutionality of the act in question. Without his vote the act did not receive the majority vote of the Senators-elect, and failed of passage.

For these reasons the county of Dickinson was not organized, and Menominee county stands intact, with all the territory originally belonging to it, for all purposes, and the board of supervisors should spread the tax apportioned to it.

I think the writ of *mandamus* should have been granted.

GRANT, J., concurred with LONG, J.